IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| AHMED MOHAMMAD AJAJ, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 0:03-3776-CMC-BM |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF | ) | |
| AMERICA, DAN L. DOVE, | ) | |
| "FNU" ALLEN, "FNU" | ) | **REPORT AND RECOMMENDATION** |
| GRAVETTE, KATHLEEN | ) | |
| HAWK, MICHAEL COOKSEY, | ) | |
| STAN YATES, "FNU" WADE, | ) | |
| "FNU" VINING, "FNU" | ) | |
| FINNERTY, JOSEPH SMITH, | ) | |
| "FNU" IRVING, "FNU" PAUL, | ) | |
| "FNU" CHARTIER, "FNU" | ) | |
| BERRY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to Bivens v. Six Unknown

Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging violations of his

constitutional rights, as well as pursuant to the Federal Tort Claims Act (FTCA),  28 U.S.C. §§

2671-2680, et. seq.. Plaintiff's original Complaint filed December 16, 2003 was amended pursuant

to a supplement filed July 15, 2005.  See Order filed November 4, 2005 [setting forth which claims

contained in Plaintiff's supplemental Complaint are properly before this Court].

The Defendants Hawk and Cooksey filed a motion to dismiss on December 28, 2005.

As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on January 3, 2006,

advising Plaintiff of the importance of a dispositive  motion and of the need for him to file an



adequate response. Plaintiff was specifically advised that if he failed to respond adequately, these Defendants' motion may be granted.

On February 1, 2006, the Defendant Paul filed a separate motion for summary judgment, following which a second Roseboro order was issued on February 13, 2006. Along with numerous requests for extensions of time, on March 10, 2006 Plaintiff filed motions and declarations to deny Paul's motion for summary judgment and Hawk and Cooksey's motion to dismiss. Thereafter the Defendants (with the exception of the Defendants Paul and Berry) filed a "supplement" to their original motion for summary judgment, which had been filed on May 24, 2005 (that motion had been stayed pending completion of discovery by order of the Court filed June 30, 2005). The Defendant Berry then filed a separate motion for summary judgment on March 24, 2006. A third Roseboro order was issued by the Court on March 27, 2006, and Plaintiff filed "motions" to deny these summary judgment motions on April 3, 2006.

Plaintiff has also filed numerous motions to stay and/or for extensions of time, and on May 30, 2006 Plaintiff was granted until July 31, 2006 to file any additional responses he wished to file to the outstanding motions to dismiss or for summary judgment. See Order filed May 30, 2006 (text order). Plaintiff thereafter filed a response in opposition to the Defendants' Hawk and Cooksey's motion to dismiss on June 2, 2006. No additional filings purporting to be responses to the Defendants' dispositive motions have been received.[1] Defendants' motions are now before this Court for disposition.[2]

---

[1]Plaintiff did, however, file yet another motion for an extension of time on July 20, 2006. That motion has been denied by separate order.

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed motions to dismiss and for summary



## Background and Evidence[3]

Plaintiff alleges in his verified Complaint[4] that in 2001, while he was incarcerated at the Federal Correctional Institution in Edgefield, South Carolina[5], he was unlawfully placed in solitary confinement. Plaintiff further alleges that during the time of this confinement, August 31, 2001 through September 4, 2001, he was "subjected to constant taunts, harassment, physical and mental pain as a result of the harassment and my unlawful [ ] placement in solitary confinement." Plaintiff alleges that after he was released from solitary confinement on September 4, 2001, he discovered in November 2001 that the Defendants Berry and Paul had called his unit officer on August 31, 2001 pretending to be of Middle Eastern descent. Plaintiff alleges that the purpose of this phone call was to create fear among prison security, and that his placement in solitary confinement was as a result of this telephone call. Plaintiff alleges that he had complained to the Defendant Allen about Berry's "unprofessional behavior" prior to August 31, 2001, but that Allen had ignored his complaints and failed to take any action. Plaintiff alleges that Allen's failure to act further encouraged Berry and other officers to continue their unprofessional conduct toward him.

---

judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[3]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

[4]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case.

[5]Plaintiff is currently incarcerated at the United States Penitentiary in Florence, Colorado.



Plaintiff alleges that on September 11, 2001, he was ordered back into solitary by Defendants Hawk and Cooksey "without any disciplinary proceeding or security justification and in violation of the Bureau of Prison's own rules and regulations."[6] Plaintiff alleges that this conduct violated his "liberty interest in remaining in the general population."  Plaintiff further alleges that from September 11, 2001 through October 30, 2001, the Defendants Hawk, Cooksey and Dove unlawfully denied him access to the Courts, his attorneys, his jailhouse lawyer, and "the outside world" in violation of his right to due process.  Plaintiff alleges that from October 9, 2001 through October 16, 2003, the Defendants Dove, Yates, Allen, Gravette, Wade, Vining, and Finnerty "subjected me to constant torture, taunts, harassment, physical and mental torment and denied me my basic human needs without any due process."  He also alleges that, from September 11, 2001 through August 26, 2002, he was "exposed to constant high noise level that cause me a chronic sleep deprivation," and that the Defendants Dove, Yates, Allen, Gravette, Wade, Vining, and Smith failed to take any corrective action to reduce the high noise level in the special housing unit.

Plaintiff next alleges that from the period February 1, 2001 through June 27, 2002, the Defendants Dove, Yates, Allen and Irving denied him access to dental care, and that as a result he developed "infections and abscesses." Plaintiff alleges that from September 11, 2001 through August 26, 2002, the Defendants Dove, Yates, Allen, Smith and Chartier also denied him his "basic religious rights," and that during this same period of time, he was "placed...under conditions to my physical and mental health..., denied...procedural due process..., [and] denied...access to [his] jail-house and legal assistants.  Plaintiff seeks monetary damages. See generally, Verified Complaint.

---

[6]Plaintiff alleges that, although he is now in the federal penitentiary in Florence, Colorado, he is still in solitary confinement.



In the verified supplement to his Complaint, in which Plaintiff asserts claims against the United States under the FTCA, Plaintiff alleges that his being subjected to high noise levels was negligent and a violation of the standard of care owed to the Plaintiff, and that the Defendant's negligence exposed him to "constant high level of noise that caused [Plaintiff] to suffer from sleep deprivation, chronic insomnia and other physical and mental suffering...." from September 11, 2001 through August 26, 2002.  Plaintiff also alleges that the Defendants failed to provide him with proper dental care between February 1, 2001 and June 27, 2002, which care fell below the "minimum standards of acceptable professional practice."   Plaintiff alleges that the Defendants' failure in this regard resulted in him developing "infection[s], abscesses and pain," resulting in "serious, permanent and continuing injuries and damages...."  Finally, Plaintiff complains that the Defendants were negligent in failing to protect him from physical and mental abuses from government employees and agents, all as outlined in his original Complaint.  See generally, Plaintiff's Supplement to his Complaint; see also Order filed November 4, 2005 [setting forth what claims from Plaintiff's supplement to his Complaint are properly before this Court].  Plaintiff again seeks monetary damages, as well as redesignation to a different facility.

In support of summary judgment in the case, the Defendants have submitted voluminous evidence and exhibits.  This material establishes that Plaintiff was incarcerated at FCI Edgefield from February 1, 2001 through August 28, 2002 following his conviction in 1994 as being part of the original World Trade Center bombing plot.[7]  Defendants' Exhibits A, I, J.  The Defendant Tyrone Allen has submitted an affidavit (Defendants' Exhibit I) wherein he attests that he is

---

[7]This was not the successful terrorist strike of September 11, 2001, but was the previous unsuccessful attempt at destroying the World Trade Center in 1993.  See Defendants' Exhibits I, J.



Associate Warden of Programs at FCI Edgefield.  Allen attests that Plaintiff was one of six persons convicted in the first attack on the World Trade Center in 1993, and that because of Plaintiff's status and the uncertainty as to how the general population would react toward him, Plaintiff was placed in the prison's special housing unit (SHU) following the second attack on the World Trade Center on September 11, 2001, where he remained pending his transfer to Colorado on August 28, 2002. Allen attests that this placement was for Plaintiff's own personal protection, as well as to maintain the safe and orderly operation of the prison.  Allen attests that he never tortured, taunted, harassed, or subjected Plaintiff to physical and/or mental pain at any time, and that he does not recall Plaintiff complaining to him about being subjected to unprofessional behavior by the Defendant Berry prior to August 31, 2001.  Allen attests that there was an incident between Plaintiff and Berry on August 31, 2001 where Plaintiff stated that Berry acted unprofessionally toward him, and that Plaintiff was thereafter placed in the SHU pending an investigation of the matter by the Office of Internal Affairs.

Allen further attests that, with respect to the period October 9, 2001 through October 16, 2001, Plaintiff was placed in ambulatory restraints in the observation cell in SHU because of his disruptive behavior and conduct of destroying government property.   Allen attests that on October 9, 2001, Plaintiff deliberately flooded his cell by blocking up the toilet and then continually flushing the toilet, causing water to overflow onto the cell floor. Allen attests that Plaintiff was removed from his cell and placed into an observation cell, following which Plaintiff became disruptive in the observation cell by breaking off the sprinkler head from the fire protection unit, causing the cell to flood with water.  See Defendants' Exhibit F (Response to Administrative Remedy).  Allen attests that, due to Plaintiff's continuous disruptive behavior, a use of force team placed him in ambulatory restraints, but that even while in ambulatory restraints, Plaintiff told staff that he would continue his



disruptive behavior if removed from the restraints. <u>Id.</u> The following day (October 10, 2001) Plaintiff attempted to break the sprinkler head in the observation cell, threw his food tray on the range floor from the food slot, and slipped the belly chain from his waist while in ambulatory restraints. <u>Id.</u> Plaintiff was warned that further actions would result in his being placed in soft, four point restraints.[8]

Allen attests that by October 12, 2001, Plaintiff had refused his eighth consecutive meal and complained of stomach pain, following which he was taken to the Health Services Department and a medical assessment was performed. Plaintiff later agreed to eat after a court order for forced feeding was obtained. <u>See</u> <u>also</u> <u>Plaintiff's Exhibit H [Order of the Honorable Margaret B. Seymour, United States District Judge]</u>. Allen attests that there is no documentation from this time period to support Plaintiff's claims that he was tortured, taunted, harassed, or subjected to physical and mental pain by him [Allen] or any other Defendant.

With respect to Plaintiff's allegations that he was exposed to a constant high level of noise which caused him sleep deprivation, Allen attests that he has no knowledge that any such allegations were expressed to executive staff until Plaintiff filed a formal administrative remedy on June 17, 2002. Allen attests that the log book maintained by staff does not reflect any complaints by the Plaintiff of not being able to sleep due to noise, and that in fact a significant number of log entries indicate Plaintiff slept in normal amounts and patterns. Allen further attests that Plaintiff never personally complained to him about the noise level, even though he spoke to Plaintiff periodically during his routine SHU visits. Allen also attests that he does not personally provide

---

[8]Allen goes on to attest that Plaintiff's ambulatory restraints were removed after he displayed less hostility toward staff. <u>Allen Affidavit</u>, ¶ 6.



dental care to inmates, nor does he recall Plaintiff personally complaining to him about being denied dental care. Allen attests that when Plaintiff filed an administrative remedy on or about May 19, 2002 complaining about not receiving dental care, the Defendant Dove referred Plaintiff to the BOP's policy specifying that only urgent dental care is provided for inmates in the special housing unit. Plaintiff then informed medical staff he had an urgent dental complaint, and he was seen and evaluated by the chief dental officer on June 27, 2002 for complaints of a tooth ache. Allen attests that Plaintiff was given an antibiotic and pain medication accordingly.

As for Plaintiff's allegations concerning the denial of basic religious rights, Allen attests that he does not personally provide religious guidance to inmates, nor does he recall Plaintiff complaining to him about being denied his basic religious needs. When Plaintiff filed an administrative remedy alleging he was being denied a visit from an Islamic Iman and other religious opportunities, this was the first time (to Allen's knowledge) that Plaintiff had made such a request. Allen attests that the Religious Services Department arranged for Plaintiff to speak with a Bureau of Prisons staff Iman for religious counseling, that he was provided with a holy Koran (the only Arabic literature available), and that he was permitted to purchase religious personal property items from the commissary that were authorized in administrative detention. Allen attests that Plaintiff was not, however, allowed a Miswak and a radio, because these were unauthorized items while housed in administrative detention. Allen attests that the administrative remedy shown on Plaintiff's forms indicates Plaintiff was also provided the opportunity to conduct his prayer sessions and the opportunity to conduct Jumah prayer alone in his cell, and that Plaintiff was given the same access to religious items as the other inmates in administrative detention. Finally, Allen attests that he has no knowledge of Plaintiff being denied procedural due process, access to a jailhouse lawyer,



or being subjected to conditions harmful to his physical and mental health. See generally, Allen Affidavit (Defendants' Exhibit I); Defendants' Exhibit AZ, pp. 109-118.

The Defendant Kahle Vinning has also submitted an affidavit, wherein she attests that she is a lieutenant at FCI Edgefield. Vinning attests that during the time period of October 9, 2001 through October 16, 2001, documentation reflects that Plaintiff was placed in ambulatory restraints in the observation cell in SHU because of his disruptive behavior or destroying government property, all as was also set forth by Allen in his affidavit. Vinning further attests to the same facts as were set forth by Allen with respect to Plaintiff's refusing food and being seen by the medical staff. As for Plaintiff's complaints of being exposed to a constant high level of noise, Vinning attests that Plaintiff never expressed any such complaints to her personally. Vinning further attests that Plaintiff was under constant staff supervision during the time period he was in the SHU, that a log book was maintained of Plaintiff's daily routine, and that there is no record that Plaintiff made complaints of not being able to sleep due to noise, and in fact the records contain a significant number of log entries indicating that Plaintiff slept in normal amounts and patterns. See generally, Vinning Affidavit (Defendants' Exhibit J).

The Defendants have also submitted an affidavit from Roy Lathrop, who attests that he is employed as a paralegal at FCI Edgefield. Lathrop attests that he has reviewed the log books maintained on the Plaintiff, Register No. 40637-053, from September 11, 2001 to August 28, 2002. Lathrop attests that Plaintiff was under constant staff supervision during that period of time, and that there are no entries in these log books that Plaintiff ever complained about not being able to sleep due to noise, while a significant number of log entries indicate Plaintiff slept in normal amounts and patterns. Lathrop further attests that there is no evidence in these records to show that Plaintiff



complained to Allen, Vinning, or the Defendant Finnerty, about the noise level in the SHU or that any Defendant ignored such complaints.  <u>See</u> <u>generally</u>, <u>Lathrop Affidavit (Defendants' Exhibit L)</u>.

The Defendant Alex Chartier has also submitted an affidavit wherein he attests that he is employed as the supervisory chaplain at FCI-Edgefield, and in this capacity is responsible for the overall supervision of all religious activities at the institution.  Chartier confirms that Plaintiff was placed in the SHU following the second attack on the World Trade Center on September 11, 2001, but attests that he is not responsible for decisions made regarding Plaintiff's placement in the SHU.  Chartier attests that, due to the gravity of Plaintiff's position following the September 11, 2001 attack, all decisions regarding his status were made by the executive staff of the institution and the Special Investigative Agent (SIA).

Chartier further attests that, although Plaintiff makes a conclusory statement in his Complaint that he [Chartier] denied Plaintiff basic religious rights, Plaintiff does not actually identify what he was purportedly denied.  Chartier attests that Plaintiff was given the same access to religious items as other inmates in administrative detention, and that Plaintiff never made a request to the Religious Services Department to have a visit or phone call from an Islamic representative.  Chartier attests that the first he heard of such a request was after Plaintiff filed an administrative remedy alleging he was being denied a visit from an Iman along with other complaints.   Chartier attests that, following the filing of Plaintiff's administrative remedy, the Religious Services Department made arrangements for Plaintiff to telephonically speak with a BOP staff Iman for religious counseling, and that Plaintiff had already been provided with a holy Quran, which was the only Arabic literature available.  Plaintiff had also already been permitted to purchase religious personal property items from the commissary that were authorized in

10



administrative detention, although he was not allowed a Miswak and a radio because these were unauthorized items. Plaintiff was, however, provided the opportunity to conduct his prayer sessions and the opportunity to conduct Jumah prayer alone in his cell. Chartier attests that he has never violated any of Plaintiff's constitutional rights, including his First Amendment right to free exercise of religion. See generally, Chartier Affidavit (Defendants' Exhibit P).

An affidavit has also been filed by Kevin Joy, a unit manager at FCI Edgefield. Joy attests that his duties include overall supervision of unit staff on a housing unit, and that during Plaintiff's time in administrative detention in the SHU he was afforded the same opportunities of all inmates who are in administrative detention. Joy further attests that Plaintiff had progress reviews in accordance to policy, as well as access to his Unit Team when different staff from the Team made mandatory rounds in the SHU. Joy attests that Plaintiff was also provided the opportunity to utilize the SHU law library or request other books and documentation from the Education Department, that he had access to medical personnel who made rounds in the SHU daily, and that he was given access to the courts and his attorney. See generally, Joy Affidavit (Defendants' Exhibit Q); Rippon Affidavit (Defendants' Exhibit C, Attachment G).

The Defendant Dan Dove has submitted an affidavit wherein he attests that during much of the relevant time period he was the Warden at FCI Edgefield, where he was charged with supervising the operation of the institution. Dove attests that as Warden, he delegated daily operational authority to associate wardens and department heads, that he therefore did not personally provide medical or dental attention to inmates, nor was he directly involved in the provision of religious services to inmates. Dove attests that he was responsible for reviewing and signing all administrative remedies filed by inmates at the institution, and that when an

11



administrative remedy was filed it was assigned to the appropriate department head for investigation. Dove attests that he did not personally investigate matters raised in an inmate's administrative remedy, but did ensure the final response was accurate and within policy prior to signing it.

Dove attests that after the World Trade Center was attacked on September 11, 2001, he had Plaintiff placed in the SHU for his own protection as he was concerned for Plaintiff's safety given his prior crime and terrorist activities. Dove attests that he submitted paperwork to the Southeast Regional Director on October 26, 2001 to have Plaintiff redesignated to Colorado in order to meet his security needs in the post 9-11 world. Plaintiff was thereafter transferred to Colorado on August 28, 2002.

Dove attests that the September 11 attack lead to an intensive nationwide crackdown on suspected terrorists and a heightened security status that continues to this day. As a convicted member of this terrorist network, and in light of Plaintiff's criminal history and participation in the 1993 attack on the World Trade Center, Dove attests that Plaintiff was placed in a higher security status on September 11, 2001, and that thereafter guidance from the Central Office was given to all institutions on how to handle inmates and detainees associated with the terrorist group responsible for the September 11 attacks. Dove attests that, based on this guidance, Plaintiff's status, and the uncertainty as to how the general population would react towards him, Plaintiff remained in administrative detention at FCI Edgefield pending his transfer. Dove specifically attests that he was concerned that Plaintiff might be targeted by other inmates because of his association with the group responsible for the 9/11 attacks and his earlier involvement in the World Trade Center



bombing, and that housing Plaintiff in the SHU was, in his best correctional judgment, the prudent thing to do.

Dove attests that while Plaintiff was housed in the SHU, he was afforded the same opportunities as any other inmate in administrative detention, including access to the administrative remedy program, which he frequently utilized. Plaintiff also had periodic progress reviews and a weekly detention review in accordance with policy, as well as access to him [Dove], the associate wardens, department heads, and his Unit Team during the mandatory weekly rounds in the SHU. Dove attests that Plaintiff was provided with the opportunity to utilize the SHU law library or to request other materials from the Education Department, that he had daily access to medical staff, and that he was able to communicate with the courts and his attorneys through correspondence, visiting, and the telephone. See Defendants' Exhibit AZ, pp. 134-147.

Dove attests that he never tortured, taunted, harassed, or subjected Plaintiff to physical and/or mental pain, nor did he allow his staff to do so. Dove attests that during the time period Plaintiff alleges he was mistreated (October 9-16, 2001), he was placed in mandatory restraints due to his disruptive behavior after he had flooded two cells on the same day. Dove attests that ambulatory restraints were used to try and calm Plaintiff's behavior, and that once he stopped trying to flood his cell and threatening harm to others the restraints were removed. Dove also attests that Plaintiff never personally complained to him about the noise level in the SHU, even though he spoke to Plaintiff periodically during his weekly SHU visits. Dove attests that he also does not recall Plaintiff personally complaining to him about being denied dental care, but that once Plaintiff filed an administrative remedy complaining about not receiving dental care on May 19, 2002, he reviewed his claim and denied same after an investigation by the Health Services



Administrator revealed dental staff were addressing Plaintiff's needs. <u>See</u> <u>Defendants' Exhibit AZ</u>, pp. 80-91.

With respect to religious materials, Dove attests that he does not personally provide religious guidance to inmates, but that in any event he does not recall Plaintiff ever complaining to him about being denied his religious needs during his weekly visits to the SHU. Plaintiff did file an administrative remedy alleging he was being denied religious rights, which Dove attests he denied after an investigation showed Plaintiff was given the same access to religious items as the other inmates in administrative detention. Plaintiff also filed an administrative remedy on November 13, 2001 alleging he was being denied access to the courts, his attorneys, and legal materials, which Dove attests he denied after an investigation revealed that Plaintiff was able to maintain contact with his attorneys by telephone. Dove attests that, initially after 9/11 and upon directions from the Central Office, all correspondence (via the use of mail) was restricted due to national security concerns, but that shortly thereafter these mail restrictions were imposed, the restrictions were lifted with respect to legal correspondence. When Plaintiff filed an administrative remedy requesting legal materials be provided to him, Dove attests that he denied this remedy after an investigation revealed staff were in full compliance with national policy regarding providing legal materials to inmates in the SHU. <u>See generally</u>, <u>Dove Affidavit (Defendants' Exhibit BQ)</u>; <u>Defendants' Exhibit AZ</u>, pp. 19, 21,23.

The Defendant Joseph Smith has also provided an affidavit, wherein he attests that from June 16, 2002 through January 24, 2004, he was the Warden at FCI Edgefield.[9] Smith attests

---

[9]Dan Dove, who is now retired, was the Warden from August 13, 2000 through June 15, 2002. <u>Dove Affidavit</u>.



that Plaintiff was an inmate at FCI Edgefield for only a short time during his tenure as Warden, and that he has been named as a Defendant because Plaintiff alleges he [Smith] mistreated him while he was housed in the SHU from the time Smith arrived (June 16, 2002) until Plaintiff's departure on August 26, 2002. Specifically, Plaintiff alleges that he [Smith] failed to address Plaintiff's complaints about the noise level and denied him access to the courts and legal assistance as well as certain religious items.

Smith attests that when he arrived at FCI Edgefield on June 17, 2002, Plaintiff was being housed in the SHU for his own protection pending transfer to a higher security prison. Smith attests that he was aware of the reasoning behind this placement, and that be believed it appropriate pending his transfer to Colorado. Smith attests that while Plaintiff was housed in the SHU, he was afforded the same opportunities as any other inmate placed in administrative detention, that he had access to executive staff and department heads as well as his Unit Team, that he was provided access to the administrative remedy program, that he had periodic progress and weekly detention reviews in accordance with policy, that he was provided the opportunity to utilize the SHU law library or request materials from the Education Department, that he had access to medical staff on a daily basis, and that he was given access to the courts and his attorneys through the use of correspondence, visiting, and the telephone.

Smith attests that Plaintiff filed a formal administrative remedy on June 17, 2002 complaining about the noise level in the SHU, which Smith attests he denied after an investigation indicated that the noise level in the SHU can, at times, be higher than in the general population, but that there was no indication the noise level was causing any harm. See Rippon Affidavit (Defendants' Exhibit 3, Attachment Exhibit B). Smith attests that, other than filing that one



administrative remedy, Plaintiff never complained to him about the noise level or about lack of sleep, even though he periodically spoke to the Plaintiff during his weekly SHU visits. Smith attests that he also does not recall Plaintiff personally complaining to him about being denied his basic religious freedoms, nor did he have any knowledge that any of his subordinates were engaged in conduct that posed a risk to Plaintiff's safety or violated his constitutional rights. See generally, Smith Affidavit (Defendants' Exhibit BR).

The Defendant James Wade has provided an affidavit wherein he attests that during the time period set forth in the Complaint, he was a lieutenant at FCI Edgefield. Wade attests that, as a lieutenant, he was not responsible for the decision made regarding Plaintiff's placement in the SHU, or the decision thereafter for Plaintiff to remain in the SHU until his transfer to Colorado. Wade attests that he was not the SHU lieutenant, so he did not have much contact with Plaintiff during the time period referenced in the Complaint, and that to the best to his knowledge he was only involved with the Plaintiff on October 12, 2001, when he supervised moving Plaintiff from the SHU to the Health Services Department. Wade attests that this was done because Plaintiff had refused to eat eight (8) consecutive meals and was complaining of abdominal pain. Wade attests that he ensured that necessary staff were available to move Plaintiff, and was present with him during the entire process, during which time no one touched or spoke to Plaintiff in an inappropriate manner.

Wade attests that he never subjected Plaintiff to conditions which caused him physical and/or mental pain, that he never harassed, tortured or taunted him, and that Plaintiff never personally complained to him about the noise level in the SHU causing him to suffer sleep



deprivation, nor did he engage in any inappropriate behavior or violate Plaintiff's constitutional rights.  See generally, Wade Affidavit (Defendants' Exhibit BS).

The Defendant S.A. Yates has submitted an affidavit wherein he attests that he was Associate Warden at FCI Edgefield during the relevant time period, where his job included direct supervision of various department heads.  Yates attests that he was involved in the initial decision to place Plaintiff in the SHU and that he fully supported that decision.  Yates attests that he believes Plaintiff being in the SHU on 9/11 and thereafter ensured his safety from other inmates who might have wanted to harm him.  Yates attests that he has never subjected Plaintiff to physical and/or mental pain, has never harassed or tortured him, and has never knowingly allowed staff to do so either.

With respect to Plaintiff's allegations that he was mistreated from October 9-16, 2001, Yates attests that during this time period Plaintiff was placed in ambulatory restraints due to his disruptive behavior of flooding his cell and threatening staff.  However, as Associate Warden of Operations, Yates attests that he was not involved in the decision to place Plaintiff in ambulatory restraints. Yates attests that he made weekly rounds in the SHU where he directly spoke to Plaintiff, and that Plaintiff never personally complained to him about suffering sleep deprivation because of alleged high levels of noise in the SHU, that he does not recall Plaintiff personally complaining to him about being denied religious items or requesting a visit from an Iman, nor does he recall Plaintiff personally complaining to him about being denied dental care.   Yates attests that, as the Associate Warden of Operations, he had oversight responsibility for the Health Services Department, which includes dental, and that if an inmate had complained to him about not receiving dental care, he would have ensured that his complaints were addressed by dental staff.

17



Finally, Yates attests that, immediately after 9/11, the BOP Central Office directed that all correspondence of convicted terrorists be restricted due to national security concerns, including legal mail. These restrictions applied to the Plaintiff because of his prior conviction in the 1993 World Trade Center bombing. Yates attests that Plaintiff was, however, able to maintain contact with his attorneys by telephone, and that shortly after the mail restrictions were imposed, they were modified to allow legal correspondence. See generally, Yates Affidavit (Defendants' Exhibit BU).

The Defendant Tim Gravette has also provided an affidavit wherein he attests that during the relevant time period he was a captain at FCI Edgefield from August 1999 to December 2001, where his duties included direct supervision of the Central Services Department (i,e, Custody). Gravette attests that he was not involved in the initial decision to place Plaintiff in the SHU, but that he was involved in the decision to keep Plaintiff in the SHU pending his transfer to a higher security institution. Gravette attests that Plaintiff's placement in the SHU on 9/11 ensured his safety from other inmates who might have wanted to harm him because of his ties to the terrorist group responsible for the 9/11 attack. Gravette attests that he has never tortured, taunted, harassed, or subjected Plaintiff to any physical or mental pain, nor has he allowed his staff to do so.

Gravette attests that on October 9, 2001, Plaintiff began deliberately flooding his cell, following which he was removed from his cell and placed in an observation cell. Plaintiff then broke the sprinkler head from the fire protection unit, causing the observation cell to flood with water, and that due to this continuous disruptive behavior a Use of Force Team placed him in ambulatory restraints. Gravette attests that, while in ambulatory restraints, Plaintiff told staff that he would continue his disruptive behavior if removed from restraints. Thereafter, on October 10,

18



2001, while still in ambulatory restraints, Plaintiff attempted to break the sprinkler head in the observation cell again, and later that day threw his food tray out of his cell onto the range floor. Plaintiff also slipped the belly chain from his waist while in ambulatory restraints, and was warned that such further actions would result in his being placed in soft, four point restraints. Gravette attests that on October 11, 2001 Plaintiff began to respond to staff's questions and displayed less hostility, and the ambulatory restraints were removed. See Defendants' Exhibit D, pp. 5-12.

Gravette attests that ambulatory restraints include handcuffs, a waist chain, a black box, and leg irons. The black box is a hard plastic box placed over the lock apparatus that runs between the inmate's handcuffs, but does not cover the hand. Gravette attests that the chain is locked in the back so that the inmate's hands, restrained by handcuffs in the black box, are pulled against his stomach, and that this is done to prevent inmates from attempting to pick the locks on their handcuffs. Gravette attests that when an inmate is in ambulatory restraints, he is still free to move around in his cell, and that policy states that these restraints should remain on an inmate until self-control is regained.

Gravette attests that Plaintiff never personally complained to him about the noise level in the SHU disrupting his sleep, even though he spoke to Plaintiff periodically during his frequent SHU visits. Gravette further attests that, immediately after 9/11, the BOP Central Office directed that all correspondence of convicted terrorists be restricted due to national security concerns, including legal mail, and that these restrictions applied to the Plaintiff. Gravette attests that Plaintiff was, however, able to maintain contact with his attorney by telephone, and that shortly after these mail restrictions were imposed, they were modified to allow legal correspondence. See generally, Gravette Affidavit (Defendants' Exhibit BV).

19



As part of Defendants' supplemental filing of March 16, 2006, Defendants submitted an affidavit from Elmer Harris, Safety Manager at FCI Edgefield. Harris attests that all BOP facilities must comply with the standards set forth by the American Correctional Association (ACA), including standards regarding noise levels. Harris attests that pursuant to Section D of the ACA (Environmental Conditions), noise level in inmate housing units are not to exceed 70 dBA (A Scale) in the daytime and 45dBA (A Scale) at night. Harris attests that a noise survey conducted on October 31, 2001 in the sleeping areas of the SHU at FCI Edgefield between 2:00 a.m. and 4:30 a.m. showed a noise level from 38 dBA to 44 dBA, which is in compliance with ACA standards.

Harris further attests that FCI Edgefield is also required to comply with ACA Section D (Sanitation and Hygiene), and that pursuant to this requirement a Safety Pest Control Log Book is used for monitoring this requirement. Harris attests that the Log Book for the time period of September 11, 2001 through August 28, 2002 indicates that on January 4, 2002, safety personnel treated the SHU with .5% Tempo II for ants, which was Pest Control Work Order No. 249. Harris attests that this was the only date during the relevant time period that eradication was required, and that he does not recall the Plaintiff ever personally complaining to him regarding either the noise level in the SHU or about his cell being infested with ants. See generally, Harris Affidavit (Defendants' Exhibit BW).

The Defendant W. Irving has also submitted an affidavit, wherein he attests that he is the staff Dental Officer at FCI Edgefield. Irving attests that, in his Complaint, Plaintiff alleges that he [Irving] denied him access to dental care from February 1, 2001 through June 27, 2002, but that he [Irving] is not familiar with the Plaintiff. Irving attests that he never examined or refused to examine the Plaintiff while he was incarcerated at FCI Edgefield, and that Plaintiff's dental



records show that Plaintiff only requested services from dental staff at FCI Edgefield on one occasion. Specifically, Irving attests that on June 27, 2002 Plaintiff complained of a tooth ache, at which time he was examined by Chief Dental Officer Sweeting, who provided Plaintiff with appropriate care including a prescription for pain medication and an antibiotic.

Irving further attests that, prior to being seen in June 2002, Plaintiff had filed an informal resolution form contending that he was being denied medical and dental treatment, which had been forwarded to Irving for a response. Irving attests that, in his response, Plaintiff was referred to the dental policy that allows inmates in the SHU to receive only emergency treatment, such as an extraction, or temporary filling with sedative dressing to relieve pain. Plaintiff was further informed that there had been no information provided to dental by the physician assistant who made daily medical rounds in the SHU that Plaintiff was having any dental trouble. Irving attests that to the best of his knowledge his response was forwarded back to Plaintiff's unit staff, and that he [Irving] never received anything else from the Plaintiff or on behalf of the Plaintiff requesting dental care. See generally, Irving Affidavit (Defendants' Exhibit BY), with Attachment A [referring to Plaintiff's Dental Records, Defendants' Exhibit M] and Attachment B [Informal Resolution Form, Defendants' Exhibit AZ].

As part of Defendants' supplemental filing, the Defendant Allen provided a second affidavit wherein, in addition to the information already provided in his initial affidavit, Allen further attests that Plaintiff's Complaint of August 31, 2001, wherein Plaintiff complained that staff had acted unprofessionally toward him which resulted in Plaintiff's placement in the SHU pending an investigation, was against both Berry as well as the Defendant Paul. As attested to in his first affidavit, Allen attests that this incident was referred to the Office of Internal Affairs. With respect



to Plaintiff's complaints that he was denied procedural due process or denied access to the courts or legal assistance, Allen attests that in order to make sure Plaintiff's rights were not violated, the executive staff at FCI Edgefield appointed staff member Chris Clark to address Plaintiff's daily needs, such as taking him to recreation five days a week if he wanted to go outside; allowing Plaintiff to call his attorneys, courts, etc.; making sure Plaintiff had his property including a Quran, a prayer rug, prayer oil, a cassette player to listen to Arabic tapes of Quran, etc.; taking Plaintiff to the SHU law library; and delivering Plaintiff's legal and social mail to him daily. See generally, Allen Affidavit (Defendants' Exhibit CA).

The Defendant Dove has also provided a second affidavit, wherein he provides as an attachment a copy of the October 1, 2001 memorandum from the BOP [titled "Guidance for Handling of Terrorist Inmates and Recent Detainees"], directing that all inmates who had been convicted of, charged with, associated with, or in any way linked to terrorist activities be placed in administrative detention. Dove also relates that, to ensure Plaintiff's rights were not violated, staff member Chris Clark was appointed to address Plaintiff's daily needs. Dove attests that Clark did not directly communicate Plaintiff's concerns to him, nor did he discuss any of the administrative forms he signed for the Plaintiff with Dove prior to signing the forms. See generally, Dove Supplemental Affidavit (Defendant's Exhibit CB).

The Defendant Chartier also submitted a supplemental affidavit, to which he has attached numerous exhibits. Chartier attests that Plaintiff was provided with the following while he was housed in administrative detention from September 11, 2001 through August 28, 2002 in order for his religious needs to met: 1) the Religious Services Department made arrangements for Plaintiff to telephonically speak with a BOP staff Iman for religious counseling [see Attachment



A (Inmate Request to Staff Member dated February 15, 2002) (Defendants' Exhibit CC, p. 6) and Attachment B (First Request by Defendants to Plaintiff for Admissions, Response No. 5) (Defendants' Exhibit CC, pp. 10-11)]; 2) Plaintiff admits he was provided with a holy Quran and at least one book on the Muslim faith while in the SHU at FCI-Edgefield [see Attachment B (First Request by Defendants to Plaintiff for Admissions, Responses Nos. 1 & 2) (Defendants' Exhibit CC, pp. 8-9) and Attachment C (Inmate Request to Staff Member dated January 11, 2002) (Defendants' Exhibit CC, p. 15];[10] 3) the Religious Services Department provided Plaintiff with twenty-four (24) audio tapes of the first portion of the Quran recited in Arabic called the Arabic Recitation of Holy Quran, and advised Plaintiff that the second portion of the tapes (twenty-four more tapes) would be provided to him when he returned the first tapes [see Attachment B (First Request by Defendants to Plaintiff for Admissions, Response No. 3) (Defendants' Exhibit CC, pp. 9-10) and Attachment D (Response to Interrogatories, No. 10(b)) (Defendants' Exhibit CC, p. 22)]. Chartier attests that Plaintiff was provided a tape player to listen to the tapes provided to him by the Religious Services Department [see Attachment E (Inmate Request to Staff Member dated January 24, 2002) (Defendants' Exhibit CC, p. 36)]; 4) Plaintiff was permitted to purchase religious personal property items from the commissary that were authorized in administrative detention [see Attachment F (copies of commissary receipts) (Defendants' Exhibit CC, pp. 37-73) and Attachment G (commissary list, including numerous religious items) (Defendants' Exhibit CC, 74-88)]; 5) Plaintiff was provided the opportunity to conduct his prayer sessions and the opportunity to conduct

---

[10]Chartier further attests that the SHU had religious books on the SHU book cart, and that Plaintiff was also provided the opportunity to request more religious books from the Religious Services Department, although he does not recall if Plaintiff requested such books. See Attachment D to Chartier Supplemental Affidavit [Response to Interrogatories, Response No. 10(b) (Defendants' Exhibit CC, p. 22)].



Jumah prayer alone, both in his cell and while in the outdoor recreation area [see Attachment D (Response No. 25(f)) (Defendants' Exhibit CC, p. 32)]; 6) Plaintiff was provided the opportunity to participate in Ramadan and partake of the meals served to inmates observing Ramadan [see Attachment H (Form 292s dated from November 16, 2001 through December 15, 2001) (Defendants' Exhibit CC, pp. 90-97)].  Chartier attests that at the start of Ramadan, he provided a list of Muslim inmates in the SHU and general population to the Food Services Department so that a sack meal would be provided each day during Ramadan and a hot meal could be served to such inmates on the list, including the Plaintiff, after sundown [see Attachment D (Response No. 20) (Defendants' Exhibit CC, p. 29)]; and that 7) Plaintiff was provided access to all three chaplains who routinely made rounds in the SHU [see Attachment I (Interrogatory 070) (Defendants' Exhibit CC, pp. 98-99)].  Chartier attests that, between himself and the other two staff chaplains, they visited the SHU a total of 147 times between September 11, 2001 and August 26, 2002, with Chartier personally visiting the SHU 36 times.  See generally, Chartier Supplemental Affidavit with Attached Exhibits (Defendants' Exhibit CC).

Defendants have also submitted an affidavit from Christopher Clark, wherein he attests that during the relevant time period he was assigned to the Special Investigative Services (SIS) Office as an SIS Technician.  Clark attests that following September 11, 2001 and the Plaintiff's placement in the SHU, executive staff at FCI Edgefield appointed him to address Plaintiff's daily needs to ensure that his constitutional rights were not violated.  Clark attests that, during this period of time, Plaintiff was his responsibility.  Clark attests that, five days a week, he offered Plaintiff recreation if he wanted to go outside; allowed Plaintiff to call his attorneys, courts,



etc., on the unmonitored phones in the lieutenant's office[11]; ensured that Plaintiff had his property including a Quran, a prayer rug, prayer oil, a cassette player to listen to Arabic tapes of the Quran, etc.; that he personally took Plaintiff to the SHU law library on numerous occasions; and that he personally delivered Plaintiff's legal and social mail to him on a daily basis.  Clark further attests that when Plaintiff complained that he did not have access to an Iman, he assisted in arranging for Plaintiff to telephonically speak to an Iman at USP Coleman.  Clark attests that, to his recollection, Plaintiff spoke to this Iman four or five times in June 2002.

Clark attests that, during this period of time, Plaintiff often requested that he sign statements regarding his conditions of confinement, but that at no time did he investigate the assertions made by Plaintiff in those requests, nor did he confer with the Warden or his supervisors prior to signing the documents drafted by the Plaintiff.  Clark further attests that Plaintiff was provided telephonic and written access to the courts and to his attorneys during the time period wherein he was assigned to the Plaintiff, and that Plaintiff was also provided access to the law library, religious materials, recreation opportunities, and legal and social mail.  Finally, Clark attests that he never witnessed any staff taunting, harassing, or subjecting Plaintiff to mental or physical pain, and that if anything Plaintiff was afforded "Cadillac" treatment during this time period in that he had one staff person [Clark] directly assigned to him to address his needs to ensure that his constitutional rights were met.  See generally, Clark Affidavit (Defendants' Exhibit CD).

Finally, Tami Rippon (supervisory attorney at FCI-Edgefield) has provided a supplemental affidavit wherein she attests that during part of the time Plaintiff was housed in the SHU a video camera was set up outside his cell to record Plaintiff's behavior, as well as his contacts

---

[11]Clark attests that, as these calls were unmonitored, there is no record of those calls.



and interaction with prison staff.  Rippon attests that she personally reviewed every videotape for the period October 9 through October 11, 2001, and that none of the surveillance footage ever shows any Defendant in this action or any other BOP staff member engaging in any improper or inappropriate behavior towards the Plaintiff.  Rippon attests that no staff member taunts, harasses, or abuses Plaintiff in any manner, and that there is no indication of any type of torture or any other improper contact on these tapes.  Rippon attests that the videotapes for this period were converted to DVDs (77 in all) and were provided to the Plaintiff in discovery.  See generally, Rippon Affidavit (Defendant's Exhibit CE).

In support of his separately filed motion for summary judgment, the Defendant Paul has submitted portions of Plaintiff's deposition taken November 3, 2005.  With respect to Plaintiff's claims of physical and/or mental pain allegedly suffered as a result of being placed in the SHU between August 31, 2001 and September 4, 2001, Paul argues that Plaintiff failed to specify any such injuries during his deposition, notwithstanding having been given numerous opportunities to do so.  See Plaintiff's Deposition, pp. 86, 129.  Plaintiff did testify about being called names, such as "terrorist" and a "towel head"; which he testified "hurt [his] feeling[s]" and was "not [their] business".  Plaintiff's Deposition, pp. 99-100 (Defendants' Exhibit BZ, pp. 4-5).  Paul argues, however, that even if such testimony was true, these incidents fail to set forth a viable claim for damages.  Paul further argues that Plaintiff's testimony that he was subjected to an undue number of searches and was denied certain items of property, including a mattress for part of one night, also fail to set forth a viable claim.  See Plaintiff's Deposition, pp. 59, 64-66, 80 (Exhibit 2 to Defendant Paul's Motion for Summary Judgment).



The Defendant Berry has also submitted excerpts from Plaintiff's deposition as an attachment to his separately filed motion for summary judgment, and makes similar arguments about Plaintiff having failed to set forth sufficient facts in his deposition testimony to survive summary judgment. See generally, Plaintiff's Deposition, pp. 98-102. Defendant Berry has also submitted an affidavit, wherein he attests that

> on 8-31-01, at approximately 8:00 p.m., a telephone call was made from the Contact room to the B-2 unit officer. The call was made directly for the unit officer. The inmate's name was selected from the front page of [unintelligible]. After the official received the call, he reported the situation to the supervisor. After the supervisor was informed, we both panicked, without reporting the situation to our supervisor. The call was made for a joke, for the unit officer, not the inmate.

See generally, Berry Affidavit.

Berry has also submitted a copy of his response to the Plaintiff's request for admissions, wherein Berry responded, inter alia, as follows:

**Question:**   On August 31, 2001, you made a telephone call to Plaintiff's unit officer.

**Response:**   This Defendant admits that, as a controlroom officer, telephone calls are routinely made to unit officers. However, this Defendant denies that he made the particular call giving rise to suit.

See Defendants' Exhibit (Response to Request for Admissions).

For his part, Plaintiff has submitted substantial filings during the course of the pretrial litigation of this case, and the undersigned has reviewed this docket in an attempt to cull out Plaintiff's evidence.[12]   The undersigned has initially reviewed Plaintiff's response to the

---

[12]Although the undersigned has generally reviewed the case docket, a complete review of every filing by the Plaintiff in this over 300 docket entry case has not been conducted. It was Plaintiff's responsibility to identify relevant, admissible evidence to support his claims. Rule 56 does not impose upon the District Court a duty to sift through the record in search of evidence to support a litigant's arguments on summary judgment. Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 115 S.Ct. 195 (1994); Malina v. Baltimore Gas & Elec., 18 F.Supp.2d 596, 604 (D.Md.



Defendants' original motion to dismiss [Document No. 73], filed in August 2004.[13]  Plaintiff also filed a "supplemental response" to the Defendants' original motion on October 20, 2004 [Document No. 88], with voluminous exhibits, and those exhibits have also been examined to determine the extent any of those exhibits deal with Plaintiff's claims on the merits. Many of those exhibits deal with the question of whether Plaintiff had exhausted his administrative remedies and/or obtained proper service on the Defendants, as those were the primary matters at issue in the Defendants' initial motion to dismiss.  However, these exhibits do include various prison grievance/ request for administrative remedy forms wherein Plaintiff sets forth his complaints about being housed in the SHU, and his desire to be released from the SHU, which have been considered by the undersigned.

Plaintiff argues in these documents that he is in no danger from the general population, and that he has always been treated well by the other inmates.  The fact that Plaintiff disagreed with the Defendants' decision, however, does not in and of itself constitute a violation of Plaintiff's constitutional rights or the Federal Tort Claims Act.  See Plaintiff's Exhibit 1. Plaintiff also complains in these exhibits about the conditions of his confinement, arguing that he was being denied "sufficient clothes and blankets" which exposed him to excessive cold, that he didn't have a mattress for a number of days, and similar complaints.  Included in Plaintiff's

---

1998); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 215 (4th Cir. 1993), cert. denied sub nom, Price v. City of Charlotte, 420 U.S. 1116 (1997).

[13]That original motion sought dismissal of claims and/or various Defendants based on procedural grounds, such as lack of exhaustion of administrative remedies and lack of subject matter and personal jurisdiction, as well as on some other grounds such as respondeat superior and qualified immunity.  Although the Defendants raise many of these same procedural service and exhaustion issues in their current motion(s), as those matters were already addressed in the undersigned's Report and Recommendation issued November 3, 2004, and the Court's Order of February 24, 2005, they have not been re-discussed in this present Report and Recommendation.  Rather, this Report and Recommendation deals with Plaintiff's claims on the merits.



materials is a copy of a West Chester Medical Center discharge summary dated February 3, 1999, on which the attending physician noted that Plaintiff should avoid exposure to excessive cold since he only had one lung, making him more susceptible to lung diseases.  See Plaintiff's Exhibit 2, p. 3.

There is also a copy of a request to staff form dated January 11, 2002, addressed to the Defendant Chartier, wherein Plaintiff requests Islamic materials from the chaplain library in the Arabic language.  This form contains a response from Chartier dated February 15, 2002, as follows:

> Our Islamic books are all very similar as far as basic instruction.  We have only a small portion of our Muslim library actually written in Arabic, and those [unintelligible] are very basic.  In light of this, we will be willing to examine additional opportunities to get some Arabic books, but this will take some time.  We will get back to you as soon as these items can be made available to you.

Plaintiff's Exhibit 2, p. 7.

Other request to staff member forms concern Plaintiff's request to see an Iman, to purchase certain items from the commissary, to have a prayer schedule, and to be placed in a "dry cell" for religious reasons.  Id, at pp. 8-11.   The responses to these requests generally reflect that prison staff were working on and/or considering Plaintiff's requests.  Id.  Plaintiff's Exhibit 2 also contains a request to staff form dated January 11, 2002, wherein Plaintiff requests to be allowed to attend Jumah prayer.  This form shows a response dated February 15, 2002 as follows: "Given your current housing situation, your request is denied." Id, p. 16. There are also various request to staff forms wherein Plaintiff writes (for confirmation purposes) that he had never been charged with any rules violations or threatened by other inmates, all of which are signed by Chris Clark "to the best of my knowledge, the above stated is true".  Id, pp. 12-15.



Pages 17 through 25 of Plaintiff's Exhibit 2 are various documents relating to Plaintiff's medical care.  In one form, dated May 15, 2002, Plaintiff complains that sick call is being conducted under conditions preventing medical privacy and meaningful evaluations because inmates can easily listen to his medical complaints when he speaks to the SHU physician assistant. The disposition for this complaint reads: "Mr. Ajaj, the HSA and I appreciate you sharing your concerns about privacy in SHU.  We have informed the SHU PA of this matter and he will make sure that your medical complaints or concerns about privacy will be taken care of.  He will be handing you a form where  you can write down what you need for sick call that day."  In another form, Plaintiff complains that medication he has been receiving for an ear infection was not helping, and requests that he be seen by Dr. "Korwen".  The disposition form on this document reads "your name will be placed on the call out for evaluation.  Watch call out daily."  On yet another form, dated January 10, 2002, Plaintiff complains that he is being denied medical help because he did not want to deal with Physician's Assistant Lamb, who Plaintiff complains shows "clear prejudice, hatred and unprofessional behavior toward me." The disposition on this form reads: "You are afforded the opportunity to make sick call on a daily basis.  Through sick call, your medical needs can be addressed.  Therefore, you are not being denied medical care."  In another document, dated January 30, 2002, Plaintiff complains that the medication brought to him the previous evening had been brought by PA Lamb, who in turn gave the medication to SHU Officer Manson to give it to him through the slot in his door.  Plaintiff states in this document that he refuses to accept any medication, treatment or examination by PA Lamb due to his "clear prejudice and unprofessional behavior toward me since Sept. 11, 01."  Plaintiff complains that Lamb's prejudice towards him might lead him to tamper with his medication.  The response to this complaint reads as follows: "Be



advised that it is your decision not to take the medication delivered by the evening PA. We are not refusing medical treatment."

Page 26 of Plaintiff's Exhibit 2 is a request to staff form dated October 29, 2001 wherein Plaintiff complains about the law library in the Special Housing Unit. Specifically, Plaintiff complains that there are no BOP program statements and policies available, other than two policies about the use of force and restraints, and the rights of pregnant female inmates, and that there is also no typewriter. The disposition section of this form reads as follows:

> This is in response to you inquiry concerning the law library in the Special Housing Unit. The bi-annual inventory was conducted on the library in June 2001. All items that were missing have been replaced. All program statements were present at the time of the inventory. Education staff will double check on the status of these program statements on their next rounds.
>
> In answer to your inquiry concerning a typewriter in SHU, it has been determined that a typewriter is a security risk. Therefore, a typewriter will not be place[d] in the SHU library. Also, documents submitted to the courts do not need to be typed. Therefore, inmates in SHU must write their documents legibly.

Plaintiff's Exhibit 2, p. 26.

In a second request to staff form (undated), Plaintiff continues to complain about not having access to a typewriter, as well as that he wants access to his "jailhouse lawyer", who he describes as "one of the inmates in the general population" who was acting as his jailhouse lawyer prior to his being placed in the SHU. The disposition section of this form, dated November 14, 2001, reads as follows:

> This is in response to your above inquiries. First, you do not have access to a typewriter while in the Special Housing Unit. You may handwrite your documents and the courts will accept them in this manner.
>
> Second, you do not have access to other inmates while in the Special Housing Unit. We cannot allow them to send things to you in segregation nor do we deliver materials to them.



<u>Plaintiff's Exhibit 2</u>, p. 27.

Exhibit 4 to Plaintiff's filing of October 20, 2004 is a FTCA claims form dated February 24, 2003, wherein Plaintiff complains about Berry and Paul allegedly fabricating an incident on August 31, 2001 in which they called his unit officer (Mr. Morgan) pretending that they were from the Middle East seeking information about him, following which he was subjected to a "shake down" and placed in the Special Housing Unit. Plaintiff further asserts in this claim form that an investigation revealed that Berry and Paul were the ones who actually called his unit officer, pretending that they were from the Middle East, which caused him to be placed in the SHU. Plaintiff claims in this form that Berry had a history of harassing him while he was working as an offices in the FCI Edgefield compound, and that he had complained "many times" about Berry's unprofessional conduct prior to August 31, 2001. Plaintiff also contends that the prison administration failed to take any corrective action or to check their computer records prior to placing him in the SHU.

Exhibit 7 to Plaintiff's filing of October 20, 2004 is an informal resolution form dated November 2, 2001, wherein Plaintiff complains that he was "denied all my basic religious needs in SHU. This constitutes violation of the First Amendment right." The correctional counselor's comments on this form state "talked to the chaplain. Chaplain has not received any [unintelligible] or any other request for anything special for your religious rights. Talked to Chaplain Chartier he states for the inmate to place his request for anything on this matter."

Plaintiff's Exhibit 8 is another informal resolution form, dated March 6, 2002, wherein Plaintiff states "I filed this complaint against the lack of care by the Health Service Department. The Health Service dentist is not providing filling or teeth cleaning for the inmate's



housed in SHU." The correctional counselor's comments on this form read "inmate is not happy with the dental service he has received while in SHU. I talked to SHA [ ] Rosario & her statement is [as follows]: "BOP policy states that only emergency treatment, that is extraction, temporary filling with sedative necessary to relieve pain will be provided while inmate is in SHU. There has been no information provided to dental by SHU - PA that inmate is having dental [unintelligible]".

Plaintiff's Exhibit 9 is an informal resolution form dated November 2, 2001, wherein Plaintiff complains about "the use of the restrain as tool of torture at SHU." There was no counseling on this particular form, as it was apparently directed to someone who was not Plaintiff's counselor at the time of the incident in question. A second informal resolution form, dated November 19, 2001, again deals with complaints about the law library. Several other informal resolution forms bear the notation that Plaintiff raises issues that are unable to be resolved at that level. One informal resolution form, dated October 31, 2001, has Plaintiff complaining about being denied a radio. Counselor's comments for that form state that Plaintiff's "radio was denied due to security reasons." This form also provides: "Talked to inmate Ajaj about trying to get it for him. Inmate Ajaj was not satisfied either way."

Exhibit 10 to Plaintiff's filing of October 20, 2004 consists of more requests to staff forms wherein Plaintiff asks Chris Clark to confirm that he is being held in the SHU and that he is complaining about his treatment.

Plaintiff's Exhibit 11 is a copy of a memorandum dated October 17, 2001 from Dr. J.A. Serrano, concerning a medical evaluation of the Plaintiff. This memorandum relates to Plaintiff's hunger strike in September/October 2001. The memorandum notes that Plaintiff was brought to the Health Services Department by the Force Cell Move Team for evaluation, since he



was only drinking fluids and not eating solids.  The form notes that Plaintiff had been "brought to the Observation Room area walking with assistance of the Team."  The memo further indicates that it was explained to the Plaintiff that he presented signs of malnutrition, whereupon he agreed to voluntarily  drink "Resource Plus and Pedialyte."   Another form, dated October 9, 2001, is a memorandum on the use of force from Operations Lieutenant Vinning.   This form states that Plaintiff was placed in restraints on October 9, 2001, following which he assisted in escorting Plaintiff to a holding cell without incident.

The Court has also reviewed Defendant Paul's response to Plaintiff's interrogatories, which were filed by the Plaintiff on March 16, 2006, wherein Paul states that he knew on September 1, 2001 that the BOP was seeking information about the phone call, and that he was questioned about it on September 3, 2001. See Attachment to Plaintiff's Motion to Compel (Court Document No. 311).

Plaintiff also filed several responses to the Defendants' dispositive motions.  In a "motion and declaration" filed March 10, 2006 (Document No. 295), Plaintiff complains about the status of discovery in this case, and that he has not been provided adequate evidence to establish his claims.  No information or evidence concerning his claims is submitted, however.  In a second "motion and declaration" filed March 10, 2006 (Document No. 296), Plaintiff makes many of these same arguments.  The undersigned notes that Plaintiff's discovery motions and like matters have been ruled on in separate orders during the course of the pretrial litigation of this case.

In a "motion and declaration" filed April 3, 2006 (Document No. 327), Plaintiff continues to complain about his lack of discovery in this case, and also complains that he has been unable to find all of the documents relevant to his claims since his release from the Special Housing



Unit in Colorado in December 2005.  In a second "motion and declaration" filed that same date (Document No. 328), Plaintiff again complains about the status of discovery in this case.

Finally, in a response filed June 2, 2006 (Document No. 373), Plaintiff makes various arguments as to why the motion to dismiss filed by the Defendants Hawk and Cooksey should not be granted, including his pro se status, that jurisdiction over these two Defendants has been properly established, and that the case against these two Defendants is even possibly subject to transfer.  Again, however, no evidence or exhibits are provided in conjunction with this filing.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56©), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.   Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).



# I.

## (<u>Bivens</u> Claim)

Since Plaintiff is a federal prisoner, his constitutional claims are evaluated under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, <u>supra</u>, which established a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights. <u>Bivens</u>, 403 U.S. at 397. A <u>Bivens</u> claim is analogous to a claim brought against state officials under 42 U.S.C. § 1983; therefore, caselaw involving § 1983 claims is applicable in <u>Bivens</u> actions, and vice versa. <u>See</u> <u>Farmer v. Brennen</u>, 511 U.S. 825 (1994); <u>Bolin v. Story</u>, 225 F.3d 1234, 1241-1242 (11th Cir. 2000); <u>Campbell v. Civil Air Patrol</u>, 131 F.Supp.2d 1303, 1310, n. 8 (M.D.Ala. 2001). As the named Defendants are federal officials, they are subject to suit under <u>Bivens</u> for damages in their individual capacities.[14]

**1) Medical Claim**. With respect to Plaintiff's medical claim regarding his dental care, in order to survive summary judgment and proceed with this constitutional claim in this Court, Plaintiff must present evidence sufficient to create a material issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Farmer</u>, 511 U.S. at 837; <u>Sosebee v. Murphy</u>, 797 F.2d 179 (4th Cir. 1986); <u>Wester v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975); <u>Belcher v. Oliver</u>, 898 F.2d 32, 34 (1990). After careful review of the affidavits and other exhibits presented to this Court, the undersigned finds and concludes that, whatever Plaintiff may think about the level

---

[14]Some of the Defendants argue, <u>inter alia</u>, that Plaintiff's claims should be dismissed because they have only been sued in their official capacities. However, giving Plaintiff's pleadings the liberal construction to which they are entitled, the undersigned has assumed for purposes of summary judgment that Plaintiff's damages claims have been asserted against the named Defendants in their individual capacities. <u>Cruz v. Beto</u>, <u>supra</u>.



of care he received, he has failed to submit evidence sufficient to create a genuine issue of material fact as to whether his *constitutional rights* were violated.

First, it must be noted that Plaintiff's allegations concerning his dental care are set forth in his verified complaint in only a general and conclusory manner. For example, he alleges in ¶ 17 of his Complaint that "[d]uring the time period of February 1, 2001, through June 27, 2002, Defendants Dan L. Dove, Stan Yates, Allen and Irving denied me access to dental care as result I developed infections and abscesses." Similarly, in the second cause of action of his supplement to his Complaint, he again only generally alleges in a conclusory fashion that during the relevant time period he was denied adequate dental care, resulting in an infection, abscesses and pain. However, Plaintiff has provided no medical evidence to support these allegations, and the Court is not required to simply accept as true general or conclusory claims and allegations absent any factual or evidentiary support. See Papasan v. Allain, 478 U.S. 265, 286 (1986)[Courts need not assume the truth of legal conclusions couched as factual allegations.]; Bender v. Suburban Hospital, Inc., 159 F.3d 186 (4th Cir. 1998); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].

While Plaintiff has provided some exhibits relating to his medical care, these documents do not show a violation of his constitutional rights. Plaintiff's Exhibit 8 (to his filing of October 20, 2004) notes only that Plaintiff was advised (after complaining that the Health Service dentist was not providing filling or teeth cleaning services) that BOP policy provides that only emergency treatment is provided to inmates while they are in the SHU. This document does not reflect that Plaintiff had any serious medical needs to which any Defendant was being deliberately

37



indifferent.  As for the remainder of Plaintiff's exhibits pertaining to his medical care, they do not even relate to his dental claim.  Rather, they merely reflect Plaintiff's complaints regarding his privacy and his dislike of the Defendant Lamb.  See Plaintiff's Exhibit 2, pp. 17-25.  Again, none of these exhibits show that Plaintiff was suffering from any serious dental condition (or any other medical condition) to which any Defendant was being deliberately indifferent.

Conversely, Allen attests in his affidavit that Plaintiff was seen and evaluated by the Chief Dental Officer on June 27, 2002 for complaints of a toothache, and was given an antibiotic and pain medication accordingly.  Dove attests in his affidavit that, after Plaintiff filed an administrative form complaining about not receiving dental care on May 19, 2002, he reviewed and denied Plaintiff's claim after an investigation by the Health Services Administrator determined dental staff were addressing Plaintiff's needs. See Defendants' Exhibit AZ, pp. 80-91. The Defendant Irving, the Staff Dental Officer at FCI Edgefield, attests in his affidavit that a review of Plaintiff's dental records show that Plaintiff only requested services from the dental staff at FCI Edgefield on one occasion, that being on June 27, 2002 when Plaintiff complained about a toothache.  Irving attests that Plaintiff was examined by Chief Dental Officer Sweeting, who provided Plaintiff with appropriate care, including a prescription for pain medication and an antibiotic.  See also, Defendants' Exhibit M [Excerpts from Plaintiff's Medical Records.  Irving further attests that, while Plaintiff had filed an informal resolution form contending that he was being denied medical and dental treatment, that there had been no information provided to the dental office by the physician assistant who made daily medical rounds in the SHU that Plaintiff was having any dental trouble.  Plaintiff's dental records, which substantiate Irving's statements, are attached to his affidavit.  See Defendants' Exhibit BY, and Attachments A & B; see also Defendants' Exhibit O.



In sum, the medical records and other evidence, including Plaintiff's own exhibits, provide no support for his medical claim. While Plaintiff was obviously dissatisfied with the dental care provided in the SHU, for a purposes of a constitutional claim, whether or not Plaintiff was provided with the care he desired or requested is immaterial. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988) [the Constitution "does not guarantee to a prisoner the treatment of his choice."]; see also Brown v. Thompson, 868 F.Supp. 326, 329-330, n. 2 (S.D.Ga. 1994); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) [A physician's actions only rise to the level of deliberate indifference when the treatment provided is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."]; Casey v. Lewis, 834 F.Supp. 1569, 1583 (D.Ariz. Apr. 5, 1993) ["[A] mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference."].

As there is no evidence before the Court sufficient to give rise to a genuine issue of fact as to whether, during the relevant time period, any named Defendant was deliberately indifferent to a serious dental condition from which the Plaintiff was suffering, this claim should be dismissed. See Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837.

**2) Excessive Force Claim**. Plaintiff also generally sets forth what is assumed to be an excessive force claim, in particular a complaint about having been placed in ambulatory restraints on or about October 9 through October 16, 2001.[15] When reviewing allegations of excessive force,

---

[15]Plaintiff does not specifically mention this particular incident in the allegations of his Complaint or supplement to his Complaint; however, it is discussed at length as part of the evidence submitted in this case.



the Court must consider 1) the need for the application of force,  2) the relationship between the need and the amount of force that was used,  3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them,  4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner. Whitley v. Albers, 475 U.S. 312, 321 (1986). See Hudson v. McMillian, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; see also United States v. Cobb, 905 F.2d 784 (4th Cir. 1990), cert. denied, 498 U.S. 1049 (1991); Taylor v. McDuffie, 155 F.3d 479 (4th Cir. 1998); Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994); Fuentes v. Wagner, 206 F.3d 335, 342 (3d Cir. 2000); Wilson v. Williams, 83 F.3d 870, 873 (7th Cir. 1996) [applied to pretrial detainee]; Thomas v. Sawyer, No. 97-2475, 1999 WL 155704 at *3 (N.D.Tex. Mar. 11, 1999); Moore v. Martinez County Jail, No. 98-731, 1998 WL 602113 at *2 (N.D.Cal. Sept. 4, 1998).

Here, the evidence before the Court shows that, with regard to the incident during which Plaintiff was placed in ambulatory restraints in October 2001, this action occurred after Plaintiff had deliberately flooded his cell by blocking up the toilet and then continually flushing the toilet, causing water to overflow onto the cell floor.  Even after Plaintiff had been removed from his cell and placed into a separate observation cell, he continued his disruptive behavior by breaking off the sprinkler head from the fire protection unit, causing that cell to flood with water.  Plaintiff was then placed in ambulatory restraints. See generally, Defendants' Exhibits E, pp. 5-12, I, J, BQ, BU, & BV.  While Plaintiff has submitted some exhibits dealing with this incident; see Plaintiff's Exhibits 9 (Informal Resolution Form dated November 2, 2001) and Plaintiff's Exhibit 11 (Memorandum on Use of Force dated October 9, 2001); neither of these exhibits provide any



evidence to substantiate any claim by the Plaintiff that he was a victim of excessive use of force.

Certainly, the allegations of Plaintiff's Complaint, wherein he makes such general and conclusory

statements as that he was subject to "constant torture" and "physical and mental torment" are not

sufficient to support this claim. Papasan, 478 U.S. at 286, Bender, 159 F.3d 186; Morgan, 829 F.2d

at 12. See also Strickler v. Waters, 989 F.2d 1375, 1380-1381 n. 9 (4th Cir. 1993) [the mere

incantation of physical and mental injury, of course, is inadequate to survive a motion for summary

judgment]; Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ["not every push or shove, even

if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's

constitutional rights"]; Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) [because prison

officials are entitled to use appropriate force to quell prison disturbances, and because these officials

oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to

prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously

and sadistically for the very purpose of causing harm].[16]

---

[16]To the extent Plaintiff is, in addition to physical abuse, also complaining about verbal harassment or taunting, even if there was evidence to support such a claim, no constitutional violation has been shown. Sluys v. Gribetz, 842 F.Supp. 764, 765, n.1 (S.D.N.Y. 1994), aff'd, Sluys v. Gribetz, 41 F.3d 1503 (2d Cir. 1994); Shabazz v. Cole, 60 F.Supp.2d 177, 199-200 (D.Mass. 1999) ["Although this court does not condone the verbal abuse [Plaintiff] received...verbal threats and insults between inmates and prison officials are a 'constant daily ritual observed in this nation's prisons.'"]; (quoting Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y. 1998)). See also Batista v. Rodriguez, 702 F.2d 393, 398 (2d Cir. 1985); Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997); Malsh v. Austin, 901 F.Supp. 757, 763 (S.D.N.Y. 1995) ["Verbal assault [or abuse], standing alone, is not a...cognizable injury in a § 1983 civil rights action"]; Shelly v. Johnson, 684 F.Supp. 941, 946-947 (W.D.Mich. 1987), aff'd, 849 F.2d 228 (6th Cir. 1987) [alleged harassment and threats even with a guard pointing a loaded gun at an inmate did not rise to the level of constitutional violation]; Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) [holding that verbal harassment or abuse, where sheriff laughed at Plaintiff and threatened to hang him, was not sufficient to state a constitutional deprivation under § 1983]. Cf. Ayala v. Terhune, No. 05-1925, 2006 WL 2355153 at *3 (3rd Cir. Aug. 15, 2006) [Plaintiff's "allegations of verbal abuse, no matter how deplorable, do not present actionable claims under § 1983."] (citing Ivey v. Wilson, 832 F.2d 950, 954-955 (6th Cir.



Therefore, to the extent Plaintiff's case includes an excessive use of force claim, it is without merit and should be dismissed.

**3) <u>Claim for Denial of Religious Rights</u>**.  With respect to Plaintiff's religious claim, Plaintiff alleges in his Complaint that "[d]uring the time period of September 11, 2001 through August 26, 2002, Defendants Dan L. Dove, Stan Yates, Allen, Smith and Chartier denied me my basic religious rights."  <u>Complaint</u>, ¶ 18. This is the only allegation with respect to Plaintiff's religious claim contained in his verified Complaint, while the admitted portions of Plaintiff's supplement to his Complaint do not even address his religious claim.  <u>See</u> <u>Plaintiff's Supplement to his Complaint</u>; <u>see also</u> Order filed November 4, 2005 (Document No. 187).

Plaintiff has submitted some exhibits which deal with his religious complaints; however, none of these exhibits is sufficient to survive summary judgment on this claim.  Plaintiff's exhibits essentially confirm that he made requests  to see an Iman, obtain Islamic materials, and similar types issues, with the responses to these requests invariably indicating or bearing notations that the prison was attempting to work with or address his concerns.  <u>See</u> <u>generally</u>, <u>Plaintiff's Exhibit 2</u>, pp. 7-11.  The only denial of a request shown in Plaintiff's exhibits is Plaintiff's request to be allowed to attend Jumah prayer.  <u>Id</u>., p. 16.  Given that, at the time, Plaintiff was an inmate in maximum security, the denial of such a request is not surprising, nor is it a violation of Plaintiff's constitutional rights.  Courts afford deference to prison officials in the administration of prisons, particularly when, as is the case here, the inmates being dealt with are inmates in administrative segregation or "lock-up".  <u>Davie v. Wingard</u>, 958 F.Supp. 1244, 1249-1251 (S.D.Ohio 1997); *cf.* <u>Hughes v. Rowe</u>, 449 U.S. 5, 20 (1980); <u>Torcasio v. Murray</u>, 57 F.3d 1340, 1355 (4th Cir. 1995);



1987).



cert. denied, 516 U.S. 1071 (1996); Hayes v. Marriott, 70 F.3d 1144, 1146 (10th Cir. 1995). See generally Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators on all administrative matters unless the condition rises to the level of a constitutional violation]. The only other significant exhibit submitted to the Court with respect to Plaintiff's religious claim is his Exhibit 7 (an informal resolution form dated November 2, 2001), wherein Plaintiff complains that he was "denied all of my basic religious needs in SHU. This constitutes violation of the First Amendment right." As previously noted, the response section on this form indicates that the correctional counselor spoke to the Chaplain, who had not received any special request relating to Plaintiff's religious rights, but that Plaintiff could submit such requests. Again, the undersigned can discern no constitutional violation in this exhibit. Courts have long held that religious practices may be restricted by prison authorities if the restrictions imposed are reasonably related to legitimate, penological interests, and Plaintiff's evidence is not sufficient to establish a violation of Plaintiff's First Amendment right to free exercise of religion. cf. Turner v. Safley, 482 U.S. 78, 89-90 (1987) [discussing four-factor test to be utilized when assessing reasonableness of regulation which impinges on a First Amendment right]; Savko v. Rollins, 749 F.Supp. 1403, 1409 (D.Md. 1990) [Limitation on the amount of in-cell religious reading material contained in prison regulation is constitutional under Turner standards]; O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987); Cruz, 405 U.S. at 319; Ali v. Dixon, 912 F.2d 86 (4th Cir. 1990), reh'g denied, 1990 U.S. App. LEXIS 18440 (4th Cir. 1990); Sweet v. South Carolina Department of Corrections, 529 F.2d 854 (4th Cir. 1975); Howard v. Smyth, 365 F.2d 428 (4th Cir. ), cert. denied, 385 U.S. 988 (1966); Muhammad v. Lynaugh, 966 F.2d 901, 902-903 (5th Cir. 1992); Sanders v. Cherry, No. 91-1436, 1992 WL 146586 (7th Cir. June 26, 1992).



Even if the Court were to consider this claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), no violation has been established. The RLUIPA provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government demonstrates that imposition of the burden on that person 1) is in furtherance of a compelling governmental interest, and 2) is the least restrictive means of furthering that compelling governmental interest. <u>See</u> 2 U.S.C. § 2000cc-1(a). Here, Plaintiff has not made a showing that the Defendants imposed a substantial burden on his religious exercise, and even if he had, the Defendants have submitted numerous exhibits and affidavits to support their contention that Plaintiff's religious rights were not violated, and indeed were accommodated, all as have been previously set forth and discussed herein, <u>supra</u>. <u>See</u> <u>generally</u>, <u>Defendants' Exhibits I, P, BQ, BR, CA, CB with Attachment A, CC with Attachments A-I, and CD</u>. In particular, the Defendant Chartier's supplemental affidavit (Defendants' Exhibit CC) sets forth in significant detail, with attached exhibits to verify, the lengths prison administration and staff went to to ensure that Plaintiff's religious needs were met. <u>Cutter v. Wilkinson</u>, 544 U.S. 709, *709 (2005) ["Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."]; <u>Hoevenaar v. Lazaroff</u>, 422 F.3d 366, 367 (6th Cir. 2005) ["RLUIPA is similar to the Religious Freedom Restoration Act of 1993 (RFRA) in that the court must determine whether the plaintiff is likely to succeed in demonstrating that the regulation in issue imposes a substantial burden on his religious exercise. Assuming the Plaintiff makes this initial showing, the court next considers whether the regulations meet strict scrutiny, i.e., the regulation must be 'the least restrictive means' towards furthering 'a compelling



government interest.' [citations omitted] Again, this test is the same as that previously imposed under RFRA."].

Hence, while controlling precedents make clear that an inmate's desire to practice his religion is not forfeited by virtue of their imprisonment, under the facts and evidence before this Court, Plaintiff has failed to establish a sufficient issue of material fact as to whether his constitutional rights have been violated to survive summary judgment, nor does the undersigned find that any violation has been established under the RLUIPA.   This claim is without merit and should be dismissed.

**4) <u>Noise Level in the SHU</u>**.  With respect to Plaintiff's complaints about the level of noise in the SHU, Plaintiff devotes two paragraphs to this claim in his verified Complaint.  In Paragraph 15, Plaintiff alleges that "[d]uring the time period of September 11, 2001, through August 26, 2002, I was exposed to constant high noise level that caused me a chronic sleep deprivation." In Paragraph 16, Plaintiff alleges that the "Defendants Dan L. Dove, Stan Yates, Allen, Gravette, Wade, Vinning and Smith failed to address complaints about high noise level and failed to take any measure to reduce the high noise level in the Special Housing Unit."  Plaintiff's first cause of action in the supplement to his Complaint expands on this claim, alleging that during the time period cited Plaintiff was "exposed to constant high level of noise that caused him to suffer from sleep deprivation, chronic insomnia and other physical and mental suffering", and that prison administrators failed to take appropriate action to correct this condition.  <u>See generally</u>, <u>Supplement to Complaint, (First Cause of Action)</u>.   However, as is the case with the other causes of action previously discussed, Plaintiff fails to provide any specifics or evidence to support these general and

45



conclusory claims and statements, or to show that the noise levels in the SHU during his period of incarceration there were such as to violate his constitutional rights.

In order to prevail on this claim, Plaintiff would need to show that he was subjected to an "objectively significantly serious" condition, and that a named Defendant with a "sufficiently culpable state of mind" failed to take action to correct this condition. See Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) [in order to state a constitutional violation, the deprivation alleged must not only be "objectively significantly serious", but the Defendant must also have acted with a "sufficiently culpable state of mind"]. Here, the only actual evidence provided to the Court shows that the noise level in the SHU was within an approved range. See Defendants' Exhibit BW. Plaintiff has provided no evidence to show otherwise. Indeed, he has provided no evidence on this issue at all. See Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; Farmer v. Brennen, 114 S.Ct. 1970, 1979 (1994) [noting that nothing in the evidence presented to the court showed that plaintiff was ever denied the minimal civilized measure of life's necessities, or that any defendant engaged in conduct "for the very purpose of causing harm or with the knowledge that harm [would] result"]; Bagola v. Kindt, 131 F.3d 632, 646 (7th Cir. 1997) ["Although prison officials need not intend that a known risk will actually harm an inmate, they must intentionally ignore this known risk in order to be liable under the Eighth Amendment."]; Lunsford v. Bennett, 17 F.3d 1574, 1580 (7th Cir. 1994) ["Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather then injure the prisoner does not demonstrate a disregard for the prisoner's welfare."]; cf. Levy, 1997 WL 112833 ["A defendant acts with deliberate indifference



only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], (quoting Farmer, 511 U.S. at 837). Therefore, this claim is without merit and subject to dismissal.

**5) Access to Court Claim**. Plaintiff also alleges that he was denied access to the courts in violation of his constitutional rights. This claim is set forth in two paragraphs in Plaintiff's verified Complaint. In Paragraph 13, Plaintiff alleges that "[d]uring the time period of September 11, 2001 through October 30, 2001, Defendants Kathleen Hawk, Michael B. Cooksey and Dan L. Dove unlawfully denied me access to courts, my attorneys, my paralegal, my jailhouse lawyer, my family and the outside world without due process." In Paragraph 21, Plaintiff alleges that these same Defendants, plus the Defendants Yates, Allen, Gravette and Smith, denied him access to his jailhouse and legal assistance.

Even though set forth in a verified Complaint, these general and conclusory allegations are, for the reasons previously set forth, insufficient to maintain a claim for denial of access to the courts. With respect to Plaintiff's exhibits, page 26 of Plaintiff's Exhibit 2 is a request to staff form dated October 29, 2001, wherein Plaintiff is complaining about the lack of BOP program statements in the law library and about the lack of a typewriter. The response to that request was that all program statements were present in the law library at the time of the last inventory, but that education staff would double check on the status of those program statements, while Plaintiff was advised that he had no right to a typewriter. Page 27 of Plaintiff's Exhibit 2 is another request to staff form, wherein Plaintiff requests access to his "jailhouse lawyer", and again complains about not having access to a typewriter. The response to that form indicates that Plaintiff does not have access to other inmates while in the Special Housing Unit, and (again) that he is not entitled to access to a typewriter. Plaintiff's only other relevant exhibit is an informal resolution

47



form dated November 19, 2001 (part of Plaintiff's Exhibit 9), which again deals with complaints about the law library.

This evidence does not show that Plaintiff was denied access to the courts in violation of his constitutional rights.  As a maximum security inmate, prison officials were certainly within their rights to deny Plaintiff access to inmates from the general population. Farmer v. Carlson, 685 F.Supp. 1335, 1344-1345 (M.D.Pa. 1988) [Plaintiff seeking the aid of other inmates foreclosed by reasonable requirements of prison security];  Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995); see also Defendants' Exhibit BP [Program Statement 1315.07 (Inmate Legal Activities), which provides, in part, that inmates may voluntarily assist other inmates in the preparation of legal documents, but that inmates are not permitted to act as legal counsel for each other, and, further, that the warden may at any time impose restrictions on an inmate's assistance to another inmate in the interest of security, good order, or discipline, and that for reasons of security, inmates in the SHU have limited access to other inmates on that unit and no access to general population inmates].  Plaintiff is also not entitled to access to a typewriter. Carroll v. North Carolina Dep't of Corrections, 91-7562, 1991 WL 158146 (4th Cir. 1991) [pro se prisoners may hand write legal papers for submission to the court]; Sasnett v. Dep't of Corrections, 891 F.Supp. 1305 (W.D.Wisconsin 1995), aff'd, 91 F.3d 1018 (7th Cir. 1996), cert. granted, judgment vacated on other grounds, 117 S.Ct. 2502 (1997); Taylor v. Coughlin, 29 F.3d 39, 40 (2d Cir. 1994); Wenzler v. Warden of GRCC, 949 F.Supp. 399, 401 (E.D.Va. 1996) ["The right of access to the courts does not



encompass a right to possess a typewriter"].  Certainly, nothing in the Defendants' evidence and exhibits shows that Plaintiff is being denied any access to the courts. See generally, Defendants' Exhibits AZ, pp. 19, 117-118, 120-123; see also Exhibits I, BQ, BR, BU and BV.  The fact that Plaintiff's use of the mail was temporarily restricted immediately after the September 11, 2001 attack, but was thereafter lifted with respect to legal correspondence, does not in and of itself constitute evidence that Plaintiff was denied access to the courts for purposes of a constitutional claim. Hossman v. Spradin, 812 F.2d 1019, 1021 (7th Cir. 1987) [Such a conclusory allegation is insufficient to survive summary judgment in the absence of a showing of actual prejudice resulting from a lack of meaningful access to the courts.].

In any event, in order to state a claim for denial of access to the courts, Plaintiff must allege both a denial of court access and some prejudice resulting from the denial of access. Strickler v. Waters, 989 F.2d 1375, 1382-1383 (4th Cir. 1993), cert. denied, 510 U.S. 949 (1993); Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987); Shango v. Jurich, 965 F.2d 289, 293 (7th Cir. 1992). In addition to Plaintiff failing to show that he lacked access to the Courts during the relevant time period, he has not shown that he suffered any prejudice as required by the applicable caselaw as regards this claim. Lewis v. Casey, 518 U.S. 343, 351-352 (1996) [While a prison inmate retains a right to the courts, to establish a claim he must allege that he suffered actual injury as a result of Defendant's actions.  An inmate cannot establish relevant actual injury simply by alleging that "his prison's law library or legal assistance program is sub par is some theoretical sense."]. Plaintiff's general and conclusory allegations that he suffered harm because he lacked access to legal materials, standing alone, are not sufficient to maintain this claim, particularly in light of the undersigned's findings discussed hereinabove.  Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) [dismissal



of access to court claim proper where inmate relied on conclusory allegations and failed to identify any actual injury]; White v. Boyle, 538 F.2d 1077, 1079-1080 (4th Cir. 1976); Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993), cert. denied, 510 U.S. 902 (1993); Proffitt v. United States, 758 F.Supp. 342 (E.D.Va. 1990); see Magee, 810 F.2d at 452 ["courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained."].   Therefore, Plaintiff's claim against the Defendants based on lack of access to the courts is without merit and should be dismissed.

  **6) Placement in the SHU**.   Plaintiff's complaints about being placed in the SHU involve two separate placements: one for the August 31, 2001 through September 4, 2001, and a second from September 11, 2001 until his transfer to Colorado.  This claim is subject to three (3) separate analyses.

   First, as a general matter, it can be stated that Plaintiff's arguments that he had a "liberty interest" in remaining in the general population, or that his placement in the SHU for security reasons without a hearing violated his constitutional rights, are without merit. Plaintiff had no constitutionally protected "liberty" interest in remaining in the general population. See generally, Slezak v. Evatt, 21 F.3d 590 (4th Cir. 1994) [the Constitution vests no liberty interest in inmates retaining or receiving any particular security or custody status as long as the conditions or degree of confinement is within the sentence imposed], cert. denied, 513 U.S. 889 (1994); Neal v. Shimoda, 131 F.3d 818, 828 (9th Cir. 1997) ["[A] prisoner does not have a constitutional right to be housed at a particular institution,..., [or] to receive a particular security classification...."]; Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) ["[A] prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is



insufficient to establish a constitutional violation."]; Hewitt v. Helms, 459 U.S. 460, 468 (1983) ["The transfer of an inmate to less amenable and more restrictive quarters for non punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."][17]; see also Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); *cf.* Sandin v. Conner, 515 U.S. 472 (1995) [holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest]; Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997) [Inmates confinement in Administrative Segregation did not impose such an atypical hardship so as to implicate a liberty interest]; Jackson v. Bostick, 760 F.Supp. 524, 528 (D.Md. 1991); Mikeska v. Collins, 900 F.2d 833 (5th Cir. 1990); James v. Reno, 39 F.Supp.2d 37 (D.D.C. 1999); Moody v. Daggett 429 U.S. 78, 88 n. 9 (1976); Locklear v. Holland, No. 98-6407, 1999 WL 1000835 at **2 (6th Cir. Oct. 28, 1999) [Prisoners generally do not have a due process liberty interest in their placement and classification while incarcerated]; Unger v. Crabtree, No. 95-36281, 1996 WL 588500 (9th Cir. Oct. 7, 1996) ["Because federal prisoners have no protected liberty interest in their custody classification levels, [Petitioner's] numerous challenges to his classification level are unavailing in this forum"]; Luken v. Scott, 71 F.3d 192, 193 (5th Cir. 1995) [holding administrative segregation placement is not a deprivation of a constitutionally cognizable liberty interest], cert. denied, 517 U.S. 1196 (1996).

       To the extent Plaintiff is asserting a due process claim, placement of an inmate in maximum security for non-punitive reasons again does not implicate the Constitution. Underwood v. Luoma, No. 03-2612, 2004 WL 1859098 at **2 (6th Cir. Aug. 17, 2004) ["A Fourteenth

---

[17]Unrelated portions of the holding in Hewitt v. Helms have been superannuated by later caselaw. This portion of the holding in Hewitt v. Helms has not been superannuated by later caselaw.



Amendment procedural due process claim depends upon the existence of a constitutionally cognizable liberty or property interest with which the state has interfered."]; <u>Montanye v. Haymes</u>, 427 U.S. 236, 242 (1976) [if a prisoner's confinement is within terms of the sentence imposed upon him and does not violate other constitutional provisions, "the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight"]; <u>Posey v. Dewalt</u>, 86 F.Supp. 2d 565, 571 (E.D.Va. 1999) ["Put simply, petitioner has not stated a due process claim because he has no protected liberty interest in a particular classification within BOP...."], <u>appeal dismissed by</u>, 215 F.3d 1320 (4th Cir. 2000), <u>cert.</u> <u>denied</u>, 531 U.S. 971 (2000); <u>Jordan v. Federal Bureau of Prisons</u>, No. 04-1104, 2006 WL 2135513 at *9 (10th Cir. July 25, 2006) ["Generally, 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore, 'administrative segregation is the sort of confinement...inmates should reasonably anticipate receiving at some point in their incarceration' and does not invoke an interest independently protected by the Due Process Clause."] (quoting <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983)); <u>Ferola v. Director of South Carolina Dep't of Corrections</u>, No. 03-2918, 2006 WL 2475396 at *17 (D.S.C. Aug. 24, 2006).

       <u>Second</u>,  with respect to Plaintiff's placement in the SHU on September 11, 2001, the undersigned notes that the constitutionality of Plaintiff's placement in the SHU following the September 11, 2001 terrorist attack on the World Trade Center has already been litigated in this Court as a habeas claim and found to have passed constitutional muster.  <u>See</u> <u>Ajaj v. Smith</u>, C/A 0:02-2417; <u>Aloe Creme Laboratories, Inc. v. Francine Co.</u>, 425 F.2d 1295, 1296 (5th Cir. 1970) [This Court may take judicial notice of its own records.].   Plaintiff's denial of relief on this claim was



affirmed by the Fourth Circuit Court of Appeals. <u>Ajaj v. Smith</u>, No. 03-7874, 108 Fed.Appx. 743 (4th Cir. July 27, 2004), <u>cert</u>. <u>denied</u>, 544 U.S. 913 (2005). Therefore, this claim is without merit and should be dismissed. <u>Aloe Creme Laboratories, Inc.</u>, 425 F.2d at 1296 [The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time. Once was sufficient.]. <u>See</u> <u>also</u> <u>Prows v. Federal Bureau of Prisons</u>, 981 F.2d 466, 468-469, n. 3 (10th Cir. 1992) [BOP has authority to designate inmate's place of confinement], <u>cert</u>. <u>denied</u>, 510 U.S. 830 (1993); <u>Barden v. Keohane</u>, 921 F.2d 476, 483 (3d Cir. 1990) (same); <u>Leibowitz v. U.S. Dept. of Justice</u>, 729 F.Supp. 556, 561 (E.D.Mich. 1989) ["Following a conviction, the trial judge cedes all jurisdiction over a convicted federal defendant to the United States Bureau of Prisons....The Bureau of Prisons enjoys almost absolute discretion over assignment, transfer, and conditions of confinement."], <u>aff'd without opinion</u>, 914 F.2d 256 (6th Cir. 1990), <u>cert</u>. <u>denied</u>, 499 U.S. 963 (1991).

   <u>Third</u>, with respect to Plaintiff's claim regarding his placement in the SHU from August 31, 2001 through September 4, 2001, Plaintiff alleges in his verified Complaint that after he had served that time in the SHU, he discovered that the Defendants Berry and Paul had called his unit officer on August 31, 2001, pretending to be of Middle Eastern descent and seeking information concerning the Plaintiff. Plaintiff alleges that the purpose of this phone call was to "create fear that the prison security was breached by Middle Eastern people", and that as a result of this telephone call he was placed in solitary confinement. Plaintiff further alleges that the Defendant Berry had a history of harassing him, and that prior to August 31, 2001 he had complained many times to the Defendant Allen about Berry's unprofessional behavior, but that Allen ignored his complaints and



failed to take any action.  Plaintiff alleges that this only encouraged Berry and other officers to continue acting unprofessionally towards him.  See generally, Complaint, ¶¶ 3-7.

Defendant Allen denies that Plaintiff ever complained to him about Berry's conduct towards him prior to August 31, 2001;  Defendants' Exhibit I, ¶ 5; and there is no documentary evidence before the Court to support Plaintiff's general and conclusory statement in his Complaint that he did so.  However, it is undisputed that Plaintiff did file a complaint against Berry as a result of his being placed in the SHU on August 31, 2001.  Id.; see also Defendants' Exhibit AZ, pp. 6-9. Allen attests that, once this matter was brought to his attention, he referred the incident to the Office of Internal Affairs for investigation, a contention supported by the other exhibits presented to the Court. Id.  The evidence further reflects that an investigation was conducted; however, the results of that investigation were not disclosed to the Plaintiff, nor have they been disclosed to the Court. See Defendants' Exhibit AZ, pp. 6-9; see also Plaintiff's Exhibit 4 [FTCA Claim Form].   For his part, the Defendant Berry denied in requests to admit that he made the particular call giving rise to this lawsuit; however, without disclosing the specifics of the phone call at issue, he does concede in his affidavit that a phone call was made "for a joke".  Both Berry and the Defendant Paul otherwise argue that, regardless of how Plaintiff ended up in the SHU on August 31, 2001, he was not thereafter held under conditions which violated his constitutional rights, citing to Plaintiff's own deposition testimony.  See generally, Plaintiff's Deposition, pp. 59, 64-66, 80, 86, 98-102, 129.

After review of this matter, the undersigned finds that, although the Plaintiff has named Associate Warden Allen as a Defendant under this cause of action, no evidence has been presented to show that Allen played any role in this purported phone call or in any of the events leading up to Plaintiff's transfer to administrative segregation on August 31, 2001.  The evidence



further reflects that, after receiving Plaintiff's complaint filed as a result of his placement in the SHU, Allen referred the matter for investigation. Therefore, there is no basis for including Allen as a party Defendant under this claim. As for Berry and Paul, while the undersigned agrees that Plaintiff has failed to submit evidence sufficient to show a separate Eighth Amendment violation with respect to the conditions under which he was held in the SHU from August 31, 2001 through September 4, 2001; see discussion, infra; whether or not Plaintiff having been placed in the SHU due to allegedly wrongful conduct by the Defendants Berry and Paul in and of itself amounts to a constitutional claim is a separate issue. *Cf.* Ashley v. Seamon, 32 Fed.Appx. 747, 749 (7th Cir. 2002) [retaliatory acts by prison officials against an inmate may in and of themselves rise to the level of a constitutional violation, even if their actions would not independently have violated the Constitution]; Nigro v. Wilson, No. 95-56347, 1997 WL 542008 at **2 (9th Cir. August 28, 1997) [prisoner's placement in administrative segregation based on his national origin may state a constitutional claim]; Leslie v. Doyle, 868 F.Supp. 1039, 1044 (N.D.Ill. 1994) [A commitment to segregation on the mere whim of a correctional officer for no penological purpose at all may violate Fourth Amendment.]; Nettles v. Griffin, 883 F.Supp. 136, 144 (E.D.Tex. 1995) [discussing damages for wrongful placement in solitary confinement or administrative segregation]; Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000) (indicating placement in administrative segregation could be adverse action].

Considered in the light most favorable to the Plaintiff, the evidence before this Court is sufficient to create at least an inference that on August 31, 2001 the Defendants Berry and Paul engaged in conduct that was directed at the Plaintiff based on his national origin or ethnicity, and which resulted in Plaintiff being placed in administrative segregation for four (4) days. Hence, to the extent these Defendants' conduct was motivated by a class-based discriminatory animus, a



question of fact has been presented as to whether Plaintiff was subjected to a violation of his right to equal protection.  Jones v. Ray, 279 F.3d 944, 946-947 (11th Cir. 2001) ["To establish an equal protection claim, a prisoner must establish that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race."]; Nigro v. Wilson, 1997 WL 542008 at **2 ["Classifications based on national origin are subject to strict scrutiny, and will only be sustained if they are suitably tailored to a compelling interest"]; see generally, Pravda v. City of Albany, 956 F.Supp. 174, 179-181 (N.D.N.Y. 1997); cf. Buford v. Sutten, No. 04-959, 2005 WL 756092 at * 3 (W.D.Wis. Mar. 29, 2005); Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) [in the prison context, transfer to administrative segregation can constitute an "adverse action" for purposes of a constitutional claim].  While Defendants may argue that, even if Plaintiff has stated a constitutional claim, he suffered no compensable damages because of the short period of time he spent in the SHU (four days), the undersigned is unable to decide this question as a matter of law. Cf. Patterson v. Coughlin, 905 F.2d 564 (2d Cir. 1990) [inmate may be entitled to at least nominal damages as a result of wrongful confinement in segregation; case remanded for trial to establish proper amount of damages, which was a factual question].

Finally, as for the Defendants Berry and Paul's contention that they are entitled to qualified immunity under this claim, this defense does not apply where the constitutional right alleged to have been violated was clearly established at the time and the facts show that it would have been "objectively reasonable" for the Defendants to know that their conduct would violate that right.  Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003); see generally, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  It can certainly be said that it was clearly established in August 2001 that

56



prison guards could not discriminate against prisoners based on their race or ethnicity. Wolff v. McDonnell, 418 U.S. 539, 556 (1974) ["Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination."]; *cf.* Bussey v. Phillips, 419 F.Supp.2d 569, 588 (S.D.N.Y. Mar. 10, 2006) [Although prisoner had no clearly established right to a particular prison job, his removal from a certain job could violate Equal Protection Clause if based on racial discrimination.].   With respect to the second prong of the qualified immunity test, the undersigned again cannot find as a *matter of law* that an "objectively reasonable" officer would not have realized that the conduct at issue here would violate that right.  Scott v. Churchill, 377 F.3d 565, 571 (6th Cir. 2004) ["Qualified immunity should be judged based on the actions of the officer and the reasonably foreseeable consequences of those actions"].  Considered in the light most favorable to the Plaintiff, whether Berry and/or Paul should have reasonably foreseen that their actions might result in adverse consequences for the Plaintiff, including his placement in administrative segregation, is a question of fact for the jury.  Therefore, these two Defendants' motion for summary judgment with respect to Plaintiff's Bivens claim over having been placed in the SHU for four days in late August/early September 2001 should be denied.

       **7) Claim Relating to General Conditions of Confinement.**    Plaintiff also generally complains about the conditions under which he was held while he was in the SHU at FCI Edgefield.  In addition to his previously discussed complaints dealing with the noise level, the condition of the law library, his religious claim, and his complaint about having spent a period of time in ambulatory restraints, Plaintiff complains about not having a mattress for a number of days, that his cell was too cold,  and that he was not given sufficient clothes and blankets.  See Plaintiff's Exhibit 2, p. 3.



To the extent any of the other complaints or grievances cited by the Plaintiff in his pleadings have not been addressed in the discussion of his individual causes of action as set forth hereinabove, these additional complaints or grievances are also subject to dismissal. Plaintiff has failed to present any evidence to establish an Eighth Amendment conditions of confinement claim with respect to these issues. See generally Strickler v. Waters, 989 F.2d 1375, 1379, 1381 (4th Cir. 1993), cert. denied, 510 U.S. 949 (1993); Shakka, 71 F.3d at 166.

During the time period set forth in the Complaint, Plaintiff was a maximum security inmate in a federal correctional facility. He was not in a hotel. It should be expected that conditions in such a setting are oftentimes less than ideal. Lunsford v. Bennett, 17 F.3d 1574, 1581 (7th Cir. 1994); Hadley v. Peters, No. 94-1207, 1995 WL 675990 *8 (7th Cir. 1995), cert. denied, 116 S.Ct. 1333 (1996) ["prisons are not required to provide and prisoners cannot expect the services of a good hotel."] (quoting Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988)). See also Smith v. Bessinger, C/A No. 0:96-2217-23BD [Report and Recommendation]. In any event, Plaintiff's allegations, such as that he suffered "physical abuse" or that it was "cold" in his cell, are so general and conclusory and otherwise lacking in evidentiary support that they simply fail to set forth a viable constitutional claim. Papasan, 478 U.S. at 286 [courts need not assume the truth of legal conclusions couched as factual allegations]; Rish, 131 F.3d at 1096 ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; cf. Chavis v. Fairman, No. 94-1503, 1995 WL 156599 at * 5-6 (7th Cir. Apr. 6, 1995) ["generally, even dramatic restrictions on outdoor exercise do not violate [the due process clause] so long as prisoners have ample opportunity to enjoy indoor activity"]; Wilson v. Timko, No. 91-16055, 1992 WL 185446, at **2 (9th Cir. August 5, 1992) [temporary restriction of amenities was



not cruel and unusual punishment]; Alberti v. Klevenhagen, 790 F.2d 1220, 1228 (5th Cir. 1986) [Eighth Amendment does not require "the provision of every amenity needed to avoid mental, physical, or emotional deterioration."]; Cochran, 73 F.3d at 1317; White, 538 F.2d at 1079-1080; Salahuddin, 992 F.2d at 449, cert. denied, 510 U.S. 902 (1993); Proffitt, 758 F.Supp. 342. Therefore, to the extent Plaintiff has asserted any claims which have not previously been addressed in this Report and Recommendation, the undersigned finds that any such claims are without merit and should be dismissed.[18]

## II.

## (FTCA Claim)

Plaintiff is also asserting some of his claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671-2680. Specifically, in the supplement to his Complaint Plaintiff alleges that the high level of noise he was subjected to in the SHU as well as the Defendant USA's failure to provide him with appropriate or adequate dental care constitute violations of the FTCA, as does the Defendant USA's failure to protect him from "physical and mental abuses by its employees and agents", in particular from the actions of the Defendants Berry and Paul. Plaintiff alleges that the Defendant USA's employees and agents were negligent, that they breached the standard of care, and that "[t]he negligent acts and omissions of Defendant USA's employees and agents are and have been the direct and proximate cause of serious, permanent and continuing injuries and damages to

---

[18]To the extent Plaintiff seeks a permanent injunction under Bivens with regard to any of the conditions existing in the FCI Edgefield SHU, as Plaintiff has now been transferred to Colorado, this claim also fails. Roe v. Operation Rescue, 919 F.2d 857, 864 (3rd Cir. 1990) ["to establish a present case or controversy in an action for injunctive relief, a plaintiff must show that he or she is likely to suffer future injury from [the] defendant's threatened illegal conduct"]; Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001) [Plaintiff's request for injunctive relief became moot when he was transferred.].



[Plaintiff]".  See generally, Supplement to Plaintiff's Complaint [setting forth Plaintiff's federal tort claims].

The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by governmental employees acting within the scope of their employment.[19] Under this act a plaintiff may recover monetary awards from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope...of...employment."  28 U.S.C.  § 1346(b).  Whether any government employee was negligent is to be determined "in accordance with the law of the place where the act or omission occurred", in this case South Carolina.  Id

In order to prove negligence in South Carolina, Plaintiff must prove by a preponderance of the evidence that 1) the Defendant had a legal duty of care; 2) the Defendant failed to discharge that duty; and 3) the Defendant's breach proximately caused him injury.  Goode v. St. Stephens United Methodist Church, 494 S.E.2d 827, 834 (S.C. 1997);  Hubbard v. Taylor, 529 S.E.2d 549 (S.C.App. 2000).  Plaintiff is required to show negligence with reasonable certainty, not through mere conjecture, and he may not attempt to prove negligence through the doctrine of res ipsa loquitur.  Eickhof v. Beard-Laney, 199 S.C. 500 (1942); Crider v. Infinger Transportation Co., 248 S.C. 10, 16 (1966). Plaintiff may show an affirmative legal duty of care to him arising from a statute if the plaintiff is a member of the class of persons the statute is intended to protect, and the essential

---

[19]In order to obtain relief in federal court under the FTCA, a litigant must first have exhausted their administrative remedies.  See 28 U.S.C. § 2675; McNeil v. United States, 508 U.S. 106, 113 (1993) ["The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."].  The United States does not contest exhaustion of administrative remedies in this case.  See Defendants' Supplement to Defendants' Motion for Summary Judgment, filed March 26, 2006, at p. 3.



purpose of the statute is to protect the plaintiff from the kind of harm he suffered.  <u>Rayfield v. South Carolina Dep't of Corrections</u>, 374 S.E.2d 910, 914 (S.C.Ct.App. 1988).  Here, an affirmative legal duty of care towards the Plaintiff does exist by virtue of 18 U.S.C. § 4042, which provides that the Bureau of Prisons "shall...provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States."

After careful review of the evidence in this case, discussed herein <u>supra</u>, and consideration of the standards required to succeed on a tort claim in this Court, the undersigned does not find that Plaintiff has set forth evidence of a viable federal tort claim sufficient to survive the Defendant United States' motion for summary judgment.  With respect to Plaintiff's claims concerning the noise level in the SHU and his dental care, he has failed to set forth any evidence that the Defendant failed to discharge its duty of care with respect to these claims, or was in any way negligent with respect to these claims.  Indeed, the only evidence presented to this Court with respect to the noise level within the FCI Edgefield SHU during the period of Plaintiff's confinement shows that the noise level was within the guidelines set by the American Correctional Association, while the evidence concerning Plaintiff's dental claim shows that the BOP policy in place at the time (Program Statement 6000.05, § 5(c)(1) and (2))[20] states that only emergency dental care is to be provided to inmates confined in the SHU.[21]  <u>See</u> <u>Defendants' Exhibits BW, BX, BY</u>.  Further, as previously discussed herein, Plaintiff has failed to provide any evidence that he suffered any injuries as a result of these claims.

---

[20]Defendants represent that this was the Program Statement in place in December 2004, during the time period relevant to Plaintiff's Complaint.

[21]Respondents represent that this policy has been recognized by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) as meeting the national standard of care. However, no supporting document showing this fact was filed.



With respect to Plaintiff's claim that he was placed in the SHU as a result of a "joke" phone call made by one or more of the Defendant USA's employees, even assuming that this conduct may have constituted a breach of the Defendant's legal duty of care and is sufficient to give rise to a genuine issue of fact as to whether Plaintiff was placed in the SHU due to these employees' negligent conduct, Plaintiff has again failed to show any injury he suffered as a result of this conduct. The undersigned has previously found that Plaintiff's general and conclusory claims about the overall conditions of his confinement while in the SHU fail to state a claim and are without merit and, unlike is the case with his *constitutional* claim, Plaintiff's mere placement in the SHU, standing alone, is not an "injury" for purposes of a tort claim.[22] *Cf.* Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999) [finding that a prisoner complaining about his placement in administrative segregation failed to demonstrate a physical injury as required by § 1997e(e) sufficient to support a claim for monetary damages]. Hence, Plaintiff's failure to show that any of the actions allegedly taken by these employees resulted in any actual injury to him is fatal to his tort claim.

---

[22]Construed liberally, it may be that Plaintiff seeks monetary compensation for the mental or emotional distress allegedly experienced as a result of his being placed in the SHU, and not just for any alleged physical injuries. However, under 28 U.S.C. § 1346(b)(2), Plaintiff cannot recover monetary damages for mental or emotional injury without a prior showing of physical injury:

> No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Therefore, to the extent Plaintiff is asserting a claim for mental or emotional injuries, it is without merit and should be dismissed. See Cassidy v. Indiana Dept. of Corrections, 199 F.3d 374, 376 (7th Cir. 2000); Taylor v. United States, No. 06-00039, 2006 WL 2350165 at *3 (W.D.Va. Aug. 11, 2006) ["The plain language of the statute [§ 1997e(e)] makes no distinction between different types of civil actions filed by inmates...[t]he FTCA specifically prohibits inmates from filing suit against the United States 'for mental or emotional injury suffered while in custody without a prior showing of physical injury.'"] (quoting 28 U.S.C. § 1346(b)(2))].



Finally, to the extent Plaintiff requests some type of declaratory or injunctive relief in addition to any monetary damages, injunctive relief is not available under the FTCA.  see Estate of Trentadue v. United States, 397 F.3d 840, 863 (10th Cir. 2005) ["[T]he District Court lack[s] subject matter jurisdiction under the FTCA to provide injunctive and declaratory relief"]; see also 28 U.S.C. § 1346(b).  Therefore, Plaintiff's claims under the FTCA are without merit, and should be dismissed.

### Conclusion

Based on the foregoing, it is recommended that the Defendant Berry and Paul's motion for summary judgment with respect to Plaintiff's Bivens claim concerning his placement in the SHU on August 31, 2001 be **denied**.  In all other respects, the Defendants' motions for summary judgment should be **granted.**

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

September 7, 2006

63



**Notice of Right to File Objections to Magistrate Judge's Report and Recommendation**
**&**
**The Serious Consequences of a Failure to Do So**

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within **ten (10) days** of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be **delivered to a United States District Judge** fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. **Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections.** Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra.; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

64

