IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Ahmed Mohammad Ajaj ) | C.A. No. 0:03-3776-CMC-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | OPINION AND ORDER |
| ) | ADOPTING |
| United States of American, Dan L. Dove, ) | REPORT AND RECOMMENDATION |
| "FNU" Allen, "FNU" Gravette, Kathleen Hawk, ) | |
| Michael Cooksey, Stan Yates, "FNU" Wade, ) | |
| "FNU" Vining, "FNU" Paul, "FNU" Chartier, ) | |
| "FNU" Berry, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

This matter is before the court on Plaintiff's *pro se* complaint arising out of his incarceration at the Federal Correctional Institution in Edgefield, South Carolina ("FCI-Edgefield"). While not so limited, his claims relate primarily to his confinement in the Special Housing Unit ("SHU") from August 31, 2001 through September 4, 2001, and again from September 11, 2001 until his transfer to FCI-Florence in August 2002. FCI-Florence is located in Colorado.[1]

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 (B)(2)(d), DSC, this matter was referred to United States Magistrate Judge Bristow Marchant for pre-trial proceedings and a Report and Recommendation on any dispositive motions. On September 7, 2006, Magistrate Judge Marchant issued a Report and Recommendation ("Report") addressing various dispositive motions including motions to dismiss and for summary judgment. The Report recommended that

---

[1] To the extent any of Plaintiff's claims relate to his transfer to FCI-Florence, or conditions of confinement at Florence, they are not properly before this court. *See Ajaj v. Smith*, 108 Fed. Appx. 743 (4th Cir. 2004) (holding that "Ajaj did not have a protected liberty interest in remaining at FCI-Edgefield" and finding that this court was "without jurisdiction over anyone with responsibility for . . . conditions" at FCI-Florence, in part because no one with responsibility over that facility was named in that action, but noting that the decision was "without prejudice to Ajaj's right to challenge the conditions of his [FCI-Florence] confinement *in the district court in Colorado*").

Plaintiff's claims relating to his confinement in the FCI-Edgefield SHU from August 31, 2001 through September 4, 2001, be allowed to proceed to the extent they were pursued against Defendants Paul and Berry. The Report recommended that the motions to dismiss or for summary judgment be granted to the extent that claim was pursued against Defendant Allen and as to all Defendants as to all other claims. The Magistrate Judge advised Plaintiff of the procedures and requirements for filing objections to the Report and Recommendation and the serious consequences if he failed to do so.

Defendants Paul and Berry filed objections to the Report, asserting that the claims against them should not be allowed to proceed. These objections are based, in part, on their assertion of a qualified immunity defense.

Plaintiff filed objections to the remaining recommendations. These objections are supported by extensive materials which the court allowed to be filed subject to later determination as to whether they should be considered. *See* Dkt No. 395.[2] The court also afforded Plaintiff significantly

---

[2] The text of this order reads as follows:

> Plaintiff's motion to reconsider his motion for extension of time to respond to the motion for summary judgment or to allow the submission of additional evidentiary materials (Dkt No. 391) is granted in part and denied in part. The court will not reconsider the denial of the extension as it relates to the Report and Recommendation. Plaintiff may, however, file the additional evidentiary materials with his objections to the Report and Recommendation. *These materials shall be accompanied by an appropriate cover document signed by Plaintiff under penalty of perjury which addresses the source and authentication of the evidentiary materials as well as the reason(s) for the delay in submission.* If Defendants challenge Plaintiff's assertions as to dates of receipt of any relevant document, they shall obtain and provide the relevant portions of the log addressed by Dkt No. 169, supported by appropriate affidavit. *The court will determine whether to consider the additional evidentiary materials when it addresses the objections to the Report and Recommendation.* Plaintiff does not need to serve Defendants with a copy of the documents referenced herein as they will be available to Defendants through the court's electronic filing system.

more than the normal time to file his objections and supporting materials and made other accommodations relating to the service of documents to insure that Plaintiff was afforded the maximum opportunity to fully present his objections). *See* Dkt No. 393 (granting Plaintiff additional sixty days to file objections); Dkt No. 395 (quoted in n. 2 above – relieving Plaintiff from any obligation to serve Defendants with copies of his submissions in this action).

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *See Mathews v. Weber*, 423 U.S. 261 (1976). The court is charged with making a de novo determination of any portion of the Report and Recommendation of the Magistrate Judge to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b).

After reviewing the record of this matter, the applicable law, the Report and Recommendation of the Magistrate Judge, the objections of the parties, and the voluminous materials submitted by Plaintiff along with his objections, the court agrees with the conclusions of the Magistrate Judge as to all recommendations and, with one exception, for the reasons stated. As to some recommendations, the court writes further to address Plaintiff's recent evidentiary submissions. As to Plaintiff's tenth objection, the court declines to adopt one basis for the recommended ruling, but otherwise adopts the Magistrate Judge's reasoning and ultimate

---

Dkt No. 395 (emphasis added).

recommendation. Accordingly, the court adopts and incorporates the Report and Recommendation by reference in this Order except to the extent indicated below.

## DISCUSSION

**I.     PAUL AND BERRY OBJECTIONS**

Defendants Paul and Berry raise two objections. Their first objection challenges the Magistrate Judge's failure to recommend that they be granted summary judgment based on their assertion of a qualified immunity defense. Their second objection challenges consideration of an equal protection basis for Plaintiff's claim given his failure to expressly assert such a theory. The court finds both objections to be without merit.

**Allegations at Issue**. The allegations relevant to this claim are described by Defendant Berry in his objections as follows:

> Taking the facts most favorably to Plaintiff, Defendant Paul called the officer on duty in Plaintiff's housing unit pretending to be of Middle Eastern descent and seeking information about Plaintiff. Defendant Berry was present when Defendant Paul made the phone call. Plaintiff's name was arbitrarily chosen from the front page of an inmate roster. After the call, the unit officer reported the event to a supervisor. At that time, Defendants Paul and Berry "panicked," and failed to immediately report the incident to the shift supervisor.
>
> * * *
>
> The record clearly reflects that Defendants Paul and Berry's sole motivation behind the telephone call was their desire to play a joke on a particular, fellow co-worker. The nature of the prank was that Defendant Paul's voice would be disguised to be that of a Middle Eastern dialect so that they could get a reaction out of their co-worker. The subsequent actions by the prison employees were primarily impulsive and reactionary -- the co-worker became anxious and notified his supervisor while both Defendants Paul and Berry got scared and failed to seek out their supervisors to own up to their involvement.
>
> . . . Defendant Berry concedes that his involvement or participation in the decision to utilize a dialect of a particular foreign-based origin or ethnicity was

>  plainly immature and inappropriate. However, the phone call, while indeed insensitive toward Middle Eastern sensibilities in a universal sense, was not intended or designed to personally discriminate against Plaintiff, rather, to play a prank intended to trick or embarrass a targeted co-worker in some fashion.

Dkt No. 394 at 1-2.

Except as to the motivation and the foreseeability of the prison official's response to the call, this description of events is a fairly accurate statement of the facts taken in the light most favorable to Plaintiff. The evidence regarding motivation is discussed below under "Equal Protection Theory." As to the foreseeability of the response, it is important to add that the call was made either on or to a secure line, thus causing prison officials to believe that their system or security had been breached. The reaction, placing Plaintiff in the SHU for several days until the event could be investigated, does not strike this court as unforeseeable given the nature of the call and the offense for which Plaintiff had been convicted (involvement in the first World Trade Center bombing).

**Qualified Immunity.** In support of their qualified immunity defense, Defendants characterize their actions as being a practical joke gone awry. Thus, they do not suggest that they were engaged in any action falling within the scope of their official duties or that any reasonable prison guards in their position would have believed that the conduct was within the scope of their authority. This, alone, precludes summary judgment in their favor on the qualified immunity defense, if not precluding the defense altogether. *See In re Allen*, 106 F.3d 582 (4th Cir. 1997).

As the Fourth Circuit explained in *In re Allen*:

> Before permitting an official to claim qualified immunity a court must determine that the official's acts were not clearly established to be beyond the scope of his authority. The defendant official bears the burden of demonstrating that the conduct of which the plaintiff complains "falls within the scope of the defendant's duties." *Shechter v. Comptroller of New York*, 79 F.3d 265, 268 (2d Cir.1996); *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.1988) (holding that for immunity an official "must first

> prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' ") (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983)); *see also Mackey v. Dyke*, 29 F.3d 1086, 1095 (6th Cir.1994) (finding that "defendants bear the initial burden ... [of] show[ing] they were acting within their discretionary authority at the time in question"); *Gray v. Bell*, 712 F.2d 490, 502 n. 36 (D.C.Cir.1983) ("It is clear that the scope of authority requirement is a prerequisite to any application of official immunity whatever the level of protection asserted or the nature of the claim involved."); *Barker v. Norman*, 651 F.2d 1107, 1124-25 (5th Cir.1981) (to claim qualified immunity, a defendant official must show that "the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority"). But, in order to ensure that public officials are adequately protected from liability, an official's conduct falls within his authority unless a reasonable official in the defendant's position would have known that the conduct was clearly established to be beyond the scope of that authority.

*In re Allen*, 106 F.3d at 594.

As noted in *Leverette v. Bell*, 247 F.3d 160, 164-65 (4th Cir. 2001), an official will not be found to have committed an action which was "clearly established to be beyond the scope of [his or her] authority" simply because the action was improper or illegal. Instead, the court considers "whether a reasonable official in [the same] position should have known that the conduct was clearly established to be beyond the scope of her authority." *Id*. (finding search which required plaintiff to "strip, squat and cough" fell within this standard in part because it did not directly contravene policy prohibiting body cavity searches).

In the present case, Berry and Paul do not suggest that any reasonable officer would have believed that the relevant actions were within the scope of his or her authority. Under their characterization of events, the actions were merely a prank. There is, moreover, no suggestion that the call served any work-related purpose. Thus, they do not satisfy the threshold requirement for application of the qualified immunity defense, even though their actions may have been enabled by their role as prison guards. *See generally, Rossignol v. Voorhaar*, 321 F. Supp. 2d 642 (D. Md.

6

2004) (finding qualified immunity unavailable to law enforcement officers who allegedly interfered with First Amendment rights of newspaper publisher while off-duty even though the actions were sufficiently connected to their role as law enforcement officers to support a finding that they acted under color of law).

Even if these Defendants could satisfy the threshold requirement discussed above, they would not be entitled to summary judgment on their qualified immunity defense. This is because their qualified immunity defense rests on a characterization of the events which is not the only reasonable interpretation of them.

Specifically, Paul and Berry assert that Plaintiff, a person of Middle Eastern descent, was merely the subject of a joke, while the "target" was a fellow officer they intended to trick or embarrass. The essence of the "joke" was a call to the targeted officer using a Middle Eastern accent and inquiring about the subject inmate (Plaintiff), who happened also to be of Middle Eastern descent.[3] They further assert that they did not intend for the inmate selected as the subject to suffer any consequence as a result of the joke, and that any injury he did suffer resulted only because they panicked after realizing their joke had gone awry and, thereafter, failed to take action to prevent harm.

The evidence, however, allows for a different interpretation of the facts. First, the accent used in the call was Middle Eastern. Plaintiff's name also suggests he is of Middle Eastern origin. When combined, these two facts allow for a reasonable inference that Plaintiff's name was not selected arbitrarily, as Paul and Berry claim, but based on his apparent ethnicity or national origin.

---

[3] Paul and Berry assert that Plaintiff's name was "arbitrarily chosen," as the subject of the joke, "from the front page of an inmate roster," and that he was not selected based on his national origin or ethnicity.

7

There is also evidence that Plaintiff's ethnicity and origin were well known within the prison, further supporting this inference. Finally, at least one of these two Defendants allegedly had made disparaging comments to Plaintiff prior to this incident which related to his national origin or ethnicity (calling him a "towel head"). Plaintiff also claims that such comments were combined with excessive and unnecessary searches from this guard which, in combination, may suggest an ethnicity or national origin-based animosity predating the August incident.[4] In light of these combined facts, a jury could reasonably conclude that Plaintiff was, in fact, selected either as the target, or at least the "subject," of the call precisely because of his known ethnicity or national origin.

As noted in the Report, it has long been settled that "[p]risoners are protected under the Equal Protection Clause . . . from invidious discrimination." Report at 57 (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). These rights, extend, for example, to claims based on denial of a right to participate in specific prison work assignments based on race. *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991) (holding that an inmate "has no right to any particular prison job, but prison officials cannot discriminate against him on the basis of his race in work assignments").

In a recent decision, a district court relied on *LaBounty* in concluding: first, that an inmate stated a claim for punitive denial of work assignments based on race and religion; and, second, that the relevant right was clearly established prior to the events in question which occurred in September 2002. *Bussey v. Phillips*, 419 F. Supp. 2d 569, 581 & 588 (S.D.N.Y. 2006).[5] Because the latter

---

[4] Other conclusions are also certainly possible, including that any animosity directed toward Plaintiff by this guard related to the basis of Plaintiff's conviction, particularly given that Plaintiff asserts that the same guard also called him a "terrorist."

[5] Bussey, a non-white Muslim, alleged that he was denied the right to return to his former job after being disciplined for a prison violation, but that white non-Muslims were allowed to return to their former jobs under similar circumstances. *Bussey,* 419 F. Supp. 2d at 582.

8

finding was based on *LaBounty*, a 1991 decision, it follows that the right was also established, at least in the Second Circuit, before the events at issue in this action which occurred in August 2001.

As summarized in *Bussey*,

> The Equal Protection Clause directs [governmental] actors to treat similarly situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)[.] . . . Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impersissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.;" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To prove an equal protection violation, a plaintiff must demonstrate intentional or purposeful discrimination, directed at an identifiable or suspect class. *See Giano*, 54 F.3d at 1057.

*Bussey*, 419 F. Supp. 2d at 581.[6]

The question, therefore, becomes whether selecting Plaintiff as the target or subject of the call constitutes "invidious discrimination," similar to the work assignment discrimination referenced above. When all of the evidence is considered in the light most favorable to Plaintiff, the court believes that it does because the evidence allows for a reasonable inference that Plaintiff was selected as the target rather than the subject of the claimed "joke." Even if only the subject, the evidence allows a reasonable inference that he was selected because of his ethnicity or national origin and that at least one of the two guards involved had previously treated Plaintiff in a manner suggesting an ethnicity or origin-based animus. It is, finally, reasonable to conclude that the guards were aware that the call would likely have adverse consequences for Plaintiff.

**Equal Protection Theory**. These Defendants' second objection rests on the argument that the Magistrate Judge erred by considering a legal basis for relief (allegations of an equal protection

---

[6] Each of the cases cited in this excerpt from *Bussey* was decided before August 2001 or quotes from a case which was decided prior to that date.

violation) not expressly set forth in the complaint. In light of the liberal rules applied to pro se complaints, the court rejects this argument.

## II.    PLAINTIFF'S OBJECTIONS

Plaintiff has asserted thirteen separate objections in his 109 page objection memorandum. *See* Dkt Nos. 407 & 408. In addition, he has filed over one thousand pages of supporting materials which include but are not limited to: responses to discovery requests; affidavits or declarations by Plaintiff and others; excerpts from Plaintiff's deposition; documentary evidence of Plaintiff's administrative complaints; copies of Bureau of Prisons policies and related regulations; and case law reprints. *See* Dkt No. 409 at 2-6 (indexing the 147 exhibits); Dkt Nos. 409-45 (exhibits). While some of the documents submitted as exhibits are self-authenticating, Plaintiff has not offered the support for their introduction required by the docket text order reflected at Dkt No. 395 (quoted above at n. 2). Thus, they are not properly before the court. The court does not, however, rely on this inadequacy in reaching the result set forth in the remainder of this order as it concludes that the proffered evidence is insufficient to present a genuine issue of material fact even if properly before the court.

The court does, however, note that much of what is offered adds little to the evidentiary record. For example, many of the documents are duplicative of each other or material already in the record, or are copies of case law, rather than evidence.[7]

Other submissions are of questionable evidentiary value and, in any event, add little to the factual record. This is the case as to two lengthy sets of answers to written interrogatories given by

---

[7]    This comment is not meant to suggest that the submission of the material was improper, only that it does not add to the evidentiary record to the extent that might otherwise be suggested by the sheer bulk of the material.

two federal inmates: Robert W. Best and Carl E. Hopkins. *See* Dkt No. 410 at 8-42 (Best responses); & Dkt No. 410 at 44-60 (Hopkins responses, partial) & Dkt No. 411 at 1-27 (Hopkins responses, continued). These interrogatory responses are signed under penalty of perjury, and are presented as "true and correct to the best information, knowledge, memory, and belief" of the respondent. Dkt No. 410 at 42; Dkt No. 411 at 27. They do not, however, purport to be based on first-hand knowledge. Moreover, many of the matters to which they refer (conditions in Plaintiff's isolation cell) would not likely be matters as to which other inmates would have first-hand knowledge.

Even if accepted as a prediction of admissible evidence, these responses add little to the relevant record because much of what they contain relates to matters which are not in dispute (*i.e.*, when Plaintiff was placed in the SHU, how he was viewed by other inmates, and the basic limitations placed on inmates in the SHU), or merely duplicates Plaintiff's own statements of fact, which have been accepted as true for purposes of the present motion. Moreover, as with many of Plaintiff's assertions of fact, the statements contained in these declarations suffer from a lack of adequate specificity to present a genuine issue of material fact. *See, e.g.,* Best response to interrogatory No. 115 (Dkt 410 at 38) (responding to inquiry whether he ever complained to prison officials "about the high level of noise in the SHU or other conditions of confinement" as follows: "Yes. I was told I needed to stay out of SHU if I didn't like the conditions.").

Finally, the affirmative responses in the declarations are, in several critical instances, contrary to Plaintiff's deposition testimony. They cannot, therefore, be considered for the purpose of contradicting Plaintiff's own statements of fact as to matters which he would personally have been in the best position to observe. *Compare, e.g.*, Best response to interrogatory 62 (Dkt 410 at 22) (responding "yes" to inquiry whether it "[i]s true that on October 9, 2001, Ajaj was forced to sleep

11

and live in dry cell with walls and bed smeared with human feces") *with* Ajaj deposition at 149-50 (Dkt No. 418 at 28-29) (responding to inquiry relating to his "feces" allegations that it was "not [a] large amount, you know, it's just in – in the edges of the bed, the food slot, certain areas . . . . corners of the windows" and conceding that any feces that had been left behind was a result of inmates doing an inadequate job of cleaning when they had been required to clean up after themselves – Plaintiff's basis for concluding the limited amount of substance he found was feces is not explained).

**First Objection**. In his first objection, Plaintiff argues that the Magistrate Judge failed to afford the proper degree of deference to Plaintiff's submissions, given the liberal standards applied to *pro se* actions. He further argues that the Report is contrary to an earlier Report in which the Magistrate Judge recommended denial of a motion to dismiss (or denial without prejudice of an early summary judgment motion) based on application of a deferential standard.

This argument misapprehends the critical distinction between a motion to dismiss, where all *allegations* of fact are accepted as true, and a motion for summary judgment, where the record *evidence* is taken in the light most favorable to Plaintiff. Having fully reviewed the Report and record evidence as of the time of issuance of the Report, the court concludes that the Magistrate Judge properly applied the relevant standard.

Further, as discussed below, the court reaches the same result even if all subsequently submitted materials are considered. This conclusion makes it unnecessary to decide whether the materials subsequently submitted should be accepted as part of the record.

**Second Objection**. In his second objection, Plaintiff argues that the Magistrate Judge failed to properly consider the evidence that Plaintiff was exposed to a constant high noise level while in the SHU and that this led to chronic sleep deprivation, thus supporting either a constitutional or

negligence (Federal Tort Claim Act) claim. The undersigned disagrees.

Plaintiff's evidence relating to the noise level relates not to any artificially created noise level, but to the banging of bars, loud noises made by inmates, and late night conversations between prisoners. *See* Dkt No. 409 at 64-71 (Plaintiff depos. at 29-36); Dkt No. 411 at 20-21 (quoted below). While Plaintiff's evidence is sufficient to suggest that the noise level was unpleasant and annoying, it is not sufficient to establish either a constitutional or negligence claim.

This is evidenced, in part, by Plaintiff's contemporaneous complaint seeking an administrative remedy for the noise problems in which Plaintiff stated:

> I respectfully request[] that the administration increase programs; activities and provide reading materials to help the inmates to stay busy in positive activities instead of banging and screaming all night. Also I request that the administration consider allowing inmates at SHU to have radios. This will help decrease the high level of noise.

Dkt No. 411 at 20-21. *See also* Dkt No. 409 at 66 (Plaintiff depos. at 31 – stating that he also sought removal of the mentally ill inmates from the SHU as a means of reducing the noise level).

The administration's response acknowledged that "the noise level in SHU can, at times, be higher than in the general population," but noted no other complaints had been received. Dkt No. 411 at 22. It further explained that reading materials and limited programs were available (the latter being limited due to "the violent and disruptive nature of inmates housed in SHU"), and indicated that staff would "be instructed to monitor the noise level . . . to assess whether or not it requires staff intervention." Id. Plaintiff's request for a "radio to offset the noise level" was denied because "local policy prohibits radios in SHU for security reasons." *Id.*

Nothing in the Plaintiff's evidence as to the noise level suggests that Plaintiff was subjected to an "objectively 'sufficiently serious'" condition or that a named Defendant failed to take action

13

to correct such a condition with a "sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162,166 (4th Cir. 1995). Neither is there any evidence to contradict Defendants' evidence that the actual noise level was tested and found to be within allowable tolerances.

Moreover, Plaintiff's requested forms of relief do not support an inference that the noise level was actually excessive and harmful, as opposed to merely being annoying and unpleasant. *See generally Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) ("Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare."). Most particularly, his request for a radio, not only for himself but for others, indicates more of a desire to mask annoying noises (as his request was interpreted by the administration), rather than to reduce an unhealthy noise level.[8]

Having considered the Plaintiff's objections and all additional evidence which he has submitted, the court rejects this objection and adopts the rationale and recommendation of the Report as to the noise-related allegations.

**Third through Eighth Objections**. The court has carefully reviewed Plaintiff's third through eighth objections which relate to his allegations of denial of dental care, failure to accommodate and protect religious rights, inadequate clothing and exposure to the cold, unhygienic conditions, excessive force and denial of access to the courts. The court finds each of these objections to be without merit, even after consideration of the additional evidentiary submissions. The court, therefore, adopts the rationale and recommendation of the Report as to each of these sets of allegations.

The court further notes that a number of the allegations contained within these objections are

---

[8] Indeed, it seems highly predictable, if not inevitable, that allowing radios to be used by inmates would raise the overall noise level.

belied by Plaintiff's recently submitted evidence. For example, Plaintiff continues to assert that he was "forced to live in a feces-covered cell that was infested with ants. " Dkt No. 407 at 35 (Sixth Objection). The assertions relating to feces far overstate Plaintiff's own testimony that he found feces on the edges of the bed and corners of the windows, and that this resulted from inadequate earlier cleaning by inmates. *See* Plaintiff depos.at 149-50 (Dkt No. 418 at 28-29) (quoted above at 12). Such testimony is inconsistent with either the assertion that the cell was "covered" in feces, or that any Defendant intentionally placed Plaintiff in a "feces-covered cell."

Similarly, Plaintiff's allegations relating to an ant infestation are inconsistent with his deposition testimony regarding how he came to be bitten.[9] His claims that one or more Defendants were consciously indifferent to his serious medical needs during the same period are, likewise, belied by the records which[10] establish that Plaintiff at times received medical attention when he requested

---

[9] Plaintiff alleges that the "dry cell" in which he was kept was infested with ants and that he suffered ant bites as a result which, in turn, required medical treatment. Dkt No. 407 at 38. Because they relate to Plaintiff's time in the "dry cell," these allegations necessarily relate to the period from October 9 to 16, 2001. Asked whether he reported the ant problem at the time, Plaintiff failed to answer directly, stating instead: "I believe I also filed about it." Plaintiff depos. at 156 (Dkt No. 418 at 35-36). Plaintiff conceded that he did not attempt to kill the ants himself, but instead allowed them to bite him, because of his religious beliefs. Plaintiff depos. at 158 (Dkt No. 418 at 35-36) (explaining "Mohammad told us not to kill ants, you know . . . [That's] why, you know, I wasn't able to do anything"). Nonetheless, the substance of his complaint is that the prison should have sprayed the ants.

As to his resulting injury, Plaintiff testified that the medical records would reflect the cream he was given to treat the ant bites. The only indication of any such treatment during the relevant time frame is a prescription for hydrocortisone cream written on November 1, 2001, at least two weeks after the period when Plaintiff alleges he was bitten. That prescription was written for "bumps on buttocks [and] thighs," making no reference to ant bites. Dkt No. 418 at 1 & 3. Moreover, there are medical records which do relate to the time Plaintiff was in the dry cell. These refer only to medical problems resulting from Plaintiff's hunger strike. *See, e.g.,* Dkt No. 418 at 10.

[10] In this document, Plaintiff states that P.A. Lamb has "for the last few months . . . showed clear prejudice, hatred and unprofessional behavior toward me," although no specifics are offered. Plaintiff further states that, despite his complaints, arrangements have not been made for him to work

15

it, and at other times refused medical evaluation or treatment offered by prison staff. *See* Dkt No. 416 at 86 & 87 (noting Plaintiff's refusal to be evaluated by a physician's assistant on October 10, 2001 and a refusal to be weighed on October 11, 2001); Dkt No. 419 at 8 (indicating Plaintiff given medication for back pain twice on October 7, 2001). *See also* Dkt No. 419 at 40-41 (Plaintiff's January 10, 2002 Request to Staff acknowledging his refusal to receive medical care from Physician's Assistant Lamb). The hunger strike, apparently coupled with the refusal to be evaluated in his cell, led to a forced move for medical evaluation. *See* Dkt No. 418 at 10.

Plaintiff also complains that he was denied a mattress while in the dry cell, but conceded in his deposition that he was allowed the mattress between the hours of 10 p.m. and 6 a.m. Plaintiff depos. at 154 (Dkt No. 416 at 78). Similarly, he alleges that he was denied blankets but, in his deposition, conceded that he did not recall if he got the blankets back after they were taken. *Id. See also* Plaintiff depos. at 153 (Dkt No. 418 at 32) (conceding that a complaint relating to blankets involved a lieutenant taking "some" blankets from Plaintiff when he had more than one.

**Ninth Objection.** Plaintiff's ninth objection relates to the recommendation that summary judgment be granted as to any claim against Defendant Allen relating to the "prank" call by Paul and Berry. This objection rests on Plaintiff's allegations that Allen failed to adequately respond to Plaintiff's prior complaints that Berry was singling Plaintiff out for harsher treatment in the form of overly frequent and zealous searches (no specifics are given other than that Plaintiff felt that Berry was "trying to search my own bones") and made comments relating to Plaintiff's "case" and "nationalities." Plaintiff depos. at 96 (Dkt No. 422 at 103). *See also* Plaintiff depos. at 98-100 (Dkt

---

with another medical professional. The prison's response to this complaint states: "You are afforded the opportunity to make sick call on a daily basis. Through sick call, your medical needs can be addressed. Therefore, you are not being denied medical care."

16

No. 422 at 105-07) (stating Berry called him a "terrorist" and "towel head" in front of other inmates). The evidence of prior complaints to Allen consists of Plaintiff's assertion that, while in the lunch line, he advised Allen that Berry was singling him out for searches and that Allen promised to "take care of it." Plaintiff depos. at 119-23 (Dkt No. 422 at 124-28).

Accepting these facts as true, and assuming Allen took no corrective action despite promising to do so, there remains insufficient evidence to tie Allen to the alleged equal protection violation, whether through a negligence or other theory. Most critically, the evidence would not support a jury finding that Allen's failure (if any) to correct Berry's earlier taunts and excessive searches was legally causative of Berry and Paul's decision to engage in the distinctly different behavior which led to Plaintiff's first placement in the SHU. To the extent any connection might be made, it could only be under a negligence theory which cannot stand for the reasons set forth in the Report. *See* Report at 62 (addressing FTCA prohibition on any award of damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury").

The court, therefore, finds Plaintiff's ninth objection to be without merit and adopts the reasoning and recommendation of the Report as to these claims.

**Tenth Objection**. In his tenth objection, Plaintiff asserts that the Magistrate Judge erred by failing to review the evidence relating to Plaintiff's "solitary confinement" claim (for the period beginning September 11, 2001). The undersigned agrees with the Magistrate Judge's conclusion as to this claim and part, but not all, of his analysis.

The court disagrees with the Magistrate Judge's analysis only to the extent it rested on an alternative ground that the claim addressed by the tenth objection was, necessarily, foreclosed by the

prior decision in *Ajaj v. Smith*, C/A 0:02-2417 ("*Ajaj I*").  *See* Dkt No. 389 at 52-53.[11]  In reviewing this court's decision in *Ajaj I*, the Fourth Circuit held that the action (which challenged Plaintiff's treatment at FCI-Edgefield, including his placement in the SHU) was properly construed as a claim under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 ( 1971).  *Ajaj I*, 108 Fed. Appx. 743 (4th Cir. 2004).  It further held that the claim was mooted by Plaintiff's transfer to FCI-Florence *because Plaintiff had only sought equitable relief*.  Given the modified basis on which the Fourth Circuit affirmed the earlier decision of this court, that earlier decision would not be dispositive of Plaintiff's present claim for damages.  This conclusion does not, however, cast any doubt on the first basis for summary judgment on this claim addressed in the Report which is adopted by this court.

Plaintiff also asserts that the United States Supreme Court's decision in *Wilkinson v. Austin*, 545 U.S. 209 (2005), requires a different result.  In *Wilkinson*, the Court found that inmates did have a liberty interest in avoiding assignment to a state's supermax prison.  In reaching this conclusion, the court carefully distinguished the supermax facilities from normal segregation units on three grounds.  First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."  545 U.S. at 214.  Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence."  *Id*.  Third, once assigned to

---

[11]    In this portion of the Report, the Magistrate Judge stated:

> [T]he constitutionality of Plaintiff's placement in the SHU following the September 11, 2001 terrorist attack on the World Trade Center has already been litigated in this Court as a habeas claim and found to have passed constitutional muster. . . . Plaintiff's denial of relief on this claim was affirmed by the Fourth Circuit Court of Appeals. . . . Therefore, this claim is without merit and should be dismissed.

Dkt No. 389 at 52-53.

18

supermax "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. After noting other onerous conditions of confinement, including that the cells were lighted 24 hours per day, the court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

While the conditions of Plaintiff's confinement in the SHU at FCI-Edgefield were more restrictive than those applied to inmates in the general population, they were not nearly so restrictive and atypical as those at issue in *Wilkinson*. The court, therefore, agrees with the Magistrate Judge that Plaintiff did not have a liberty interest in remaining out of the SHU, even if *Wilkinson* is considered for purposes of addressing this action for damages.[12]

For the reasons set forth above, the court adopts the recommendation of the Report that Defendants be granted summary judgment as to Plaintiff's claim that he was improperly transferred to the SHU on September 11, 2001 and held there until his transfer to FCI-Florence. The court rests this determination on the first rationale set forth in the Report as further addressed above.

**Eleventh and Twelth Objections.** Plaintiff's eleventh and twelfth objections are without merit.

**Thirteenth Objection.** In his thirteenth objection, Plaintiff assets that he has been unfairly disadvantaged in the presentation of his case. The undersigned disagrees. Plaintiff has been afforded numerous extensions and other accommodations to allow him to adequately prepare and present his case. The numerous exhibits proffered in support of these objections

---

[12] *Wilkinson* was decided after the events at issue in this action. It cannot, therefore, be considered in deciding what rights were clearly established at the relevant time. Consequently, even if construed as Plaintiff desires, *Wilkinson* would not support a finding in Plaintiff's favor because the Defendants subject to this claim would be entitled to qualified immunity.

demonstrate the adequacy of those accommodations.

## CONCLUSION

For the reasons set forth above, the court adopts the Report and Recommendation of the Magistrate Judge, based on the analysis stated therein, with the one limited exception set forth above and as supplemented by this order. Summary judgment shall, therefore, be entered for all Defendants on all claims with the exception of an equal protection-based Bivens claim asserted against Defendants Paul and Berry relating to the telephone call leading to Plaintiff's August 2001 placement in the SHU.

IT IS SO ORDERED.

S/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 19, 2007

O:\Civil Orders\PRISONER.OBJ\03-3776 Aja jorder adoptingR&R.wpd